FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

FEB 1 4 2018

JAMES N. HATTEN, Clerk
By:_____ Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* )<br><br>KELLI WILLIAMS, )<br><br>Plaintiff-Relator, )<br><br>v. )<br><br>SOUTHERN COMPANY, INC., )<br>SOUTHERN COMPANY SERVICES, )<br>INC., and MISSISSIPPI POWER )<br>COMPANY, )<br><br>Defendants. ) | Filed Under Seal and In Camera<br><br>**1 18-CV-0680**<br><br>Jury Trial Demanded |

## **COMPLAINT**

NOW COMES the UNITED STATES OF AMERICA *ex rel.* KELLI

WILLIAMS, by and through their undersigned attorneys, Loevy & Loevy and the

Government Accountability Project, and complaining of Defendants SOUTHERN

COMPANY, INC., SOUTHERN COMPANY SERVICES, INC., and

1

MISSISSIPPI POWER COMPANY, states as follows:

## **Background**

1.      This action seeks damages and civil penalties arising from violations of the False Claims Act, 31 U.S.C. §§ 3729, *et seq.*

2.      Defendants engaged in fraud against the United States in connection with grants from the U.S. Department of Energy ("DOE") for the Kemper Project ("Kemper"), a now-defunct "clean coal" project in Kemper County, Mississippi. In order to secure and retain hundreds of millions of dollars in DOE funding for Kemper, Defendants intentionally made material false statements about the cost, status, and commercial viability of the project.

3.      DOE is an executive department of the United States Government responsible for ensuring the nation's energy security. It provided roughly $245 million to fund Kemper as part of the Clean Coal Power Initiative ("CCPI"). The purpose of the CCPI funding was to develop a commercially viable coal plant with carbon-capture and sequestering technology.

4.      Kemper was to be completed in 2014 for a total cost of $2.4

2

billion. It was to provide jobs in mining and at the plant to some of the most economically disadvantaged workers in the country and more affordable electricity—to some of the country's poorest ratepayers (customers).

5.     Defendants intentionally concealed cost overruns and delays at Kemper to induce DOE to disburse the money and, later, not to exercise its reimbursement right. When forced to admit to cost overruns and delays, Defendants concealed the true extent of those issues and characterized them as unforeseeable, when the issues had in fact been foreseen by Defendants at the highest levels of management.

6.     In 2015 and early 2016, with the Kemper Plant still under construction and official cost estimates now exceeding $6 billion, Defendants continued to represent to DOE and the public that the plant was near completion and remained a commercially viable project, in part by exaggerating the plant's expected "availability"—the number of hours it would be able to generate electricity per year—and insisting that the plant would be running by the end of 2016. These misrepresentations allowed Defendants to secure an additional $137 million in DOE funding.

7.     In June 2017, Defendants announced that they were

3

abandoning the Kemper Project after spending over $7 billion, exceeding the original budget by more than $5 billion. The plant, they conceded, would run as a traditional natural gas power plant rather than as a clean coal plant. The Sierra Club assesses Kemper to be the most expensive power plant in history based on dollars spent in relation to electricity output.

8.    The Mississippi Public Service Commission ("MPSC"), a state regulator, approved a settlement in February 2018 between Defendants and ratepayers, who had seen their electricity costs skyrocket as a result of Kemper.

## **Parties**

9.    Relator Kelli Williams began working for Southern Company, Inc., ("Southern Company") in 2006. She served in various positions, including as a Construction Project Manager for the Kemper Project from 2010 to 2013 and in other roles on Kemper from 2015 to 2016. By virtue of her positions with Southern Company on the Kemper Project, Relator was intimately aware of Defendants' schemes and frauds, of which she has direct and independent knowledge. In 2016, Defendant Southern Company demoted Relator in retaliation for the objections she raised internally about the false information

4

Defendants were supplying to the public and state and federal governmental entities, including DOE.

10.     Defendant Southern Company is a utility holding company. Southern Company's operating subsidiaries include public utility companies located throughout the Southeastern United States, including Georgia Power, Mississippi Power, Alabama Power, Southern Power and Gulf Power. Southern Company maintains its headquarters at 30 Ivan Allen Jr. Boulevard, N.W., Atlanta, Georgia 30308. Southern Company's common stock is traded under the ticker "SO" on the New York Stock Exchange. At all relevant times, Thomas A. Fanning ("Fanning") was Chairman, President, Chief Executive Officer ("CEO") and a director of Southern Company.

11.     Defendant Southern Company Services, Inc. ("SCS"), is the shared services division of Southern Company and is headquartered in Birmingham, Alabama. Formed in 1963 as Southern Services, the company provides administrative and operational services to all of Southern Company's operating divisions. The company also provides engineering services to Alabama Power, Georgia Power, Gulf Power and Mississippi Power.

12.     Defendant Mississippi Power Company ("MPC") is a wholly-owned subsidiary of Southern Company, headquartered in Gulfport, Mississippi. MPC operates as a vertically- integrated utility providing electricity to retail customers within the State of Mississippi and to wholesale customers in the Southeast.

## Jurisdiction and Venue

13.     The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1367 and 31 U.S.C. § 3730. The allegations and transactions upon which this action is based have not been publicly disclosed. Relator also has direct and independent knowledge of the information on which the allegations are based and voluntarily provided this information to the government before filing these claims.

14.     Venue is proper pursuant to 31 U.S.C. § 3732 inasmuch as Defendant Southern Company, Inc. transacts business in this judicial district and acts proscribed by 31 U.S.C. § 3729 occurred in this district.

## DOE's Initial Funding of the Kemper Project

15.     In the Energy Policy Act of 2005, Pub. L. 109-58, 119 Stat. 594 (Aug. 8, 2005) ("2005 EPA"), Congress authorized funding to DOE to carry out the "Clean Coal Power Initiative" ("CCPI"). The CCPI was to be a

6

government/industry partnership to implement the President's National Energy Policy recommendation to increase investment in clean coal technology.

16.     Defendant Southern Company Services, Inc. ("SCS"), submitted an application to DOE under DOE's CCPI Round 2 for the Florida Project. The application was submitted on behalf of a team consisting of SCS, Southern, the Orlando Utilities Commission ("OUC"), and Kellogg Brown & Root ("KBR"), and sought $235,000,000 of DOE funds to partially finance a Demonstration Plant in Orlando, Florida co-owned by Southern and OUC ("Orlando Demonstration Plant").

17.     According to the application, the purpose of the project was "[d]emonstration of an air-blown integrated gasification combined cycle (IGCC) power plant based on [a] transport gasifier." The transport gasifier was to be based on KBR's catalytic cracking technology. The application asserted: "The transport gasifier offers a simpler and more robust method for generating power from coal than other alternatives. It is unique among coal gasification technologies in that it is cost-effective when handling low-rank coals when using coals with high moisture or high ash content."

7

18.     The application claimed that the Orlando Demonstration Plant "will gasify sub-bituminous coal and generate 285 megawatts (MW) of electricity (net) at a heat rate of 8,400 Btu/kWh (40.6 percent efficiency – higher heating value basis). The Demonstration Plant will use state-of-the-art emission controls and will be the cleanest, most efficient coal-fired power plant technology in the world. Future units based on the Demonstration Plant design will be 600 MW-class units running at efficiencies near 41.5 percent."

19.     In January 2006, DOE awarded a cost-shared cooperative agreement to Southern for the full-scale demonstration of the KBR Transport Reactor Integrated Gasification ("TRIG") technology at the OUC facility in Orlando. The initial project cost estimate was $568 million with a DOE/Southern split of $235/$333 million. The agreement was amended in March 2007 to increase the cost estimate to $844 million with a DOE/Southern split of$293/$551. The money was to be provided as a loan.

20.     Project work proceeded at Orlando. Preliminary design and National Environmental Policy Act activities were completed. Orders were placed for long lead-time items. Permitting was nearly complete.

8

21.     However, as of January 2007, a new administration took office in Florida, which did not support coal-based power production without carbon capture and sequestration ("CCS"). Project economics and distance to carbon dioxide ("$CO_2$") storage sites made CCS impossible for Orlando. Consequently, Southern and OUC could not finalize the permits, and the TRIG demonstration at Orlando was cancelled in approximately November 2007.

22.     In the meantime, on December 13, 2006, Southern's subsidiary, MPC, and Mississippi Governor Haley Barbour announced they were considering constructing a $1.8 billion coal gasification plant in Kemper County, Mississippi based on the technology being developed by the Orlando Demonstration Plant. The president of MPC was quoted in a news article reporting the announcement stating: "There are a lot of gasification technologies out there. We don't believe any of them measure up to the technology we have developed and are now prepared to go commercial with."

23.     On January 19, 2007, Southern wrote to DOE requesting that DOE allow the remaining CCPI funding provided for the Orlando Demonstration Plant to be used for the IGCC demonstration project in Kemper County, Mississippi. The

9

letter represented to DOE that front-end engineering and design effort was underway "to support commercial operation in June 2013."

24.     In February 2008, Southern and MPC requested a meeting with the DOE Secretary Samuel Bodman "to discuss allowing the remaining Clean Coal Power Initiative funding for Cooperative Agreement DE-FC26-06NT42391 to be used for an integrated gasification combined-cycle (IGCC) demonstration project in Kemper County, Mississippi." The request repeated the representation that the then ongoing front-end engineering and design work on the Kemper County project would "support commercial operation in June 2013."

25.     On February 11, 2008, the Chief Operating Officer ("COO") of Southern, Thomas A. Fanning, wrote to the Director of DOE's National Energy Technology Laboratory requesting that DOE approve the relocation of the Orlando Demonstration Plant to Kemper County. In this letter, Mr. Fanning made the following representations to DOE:

> [T]he continuation of this project in Mississippi will be a clear and dramatic response to the Department's goals of clean, secure, domestic energy for America.
>
> The Mississippi project has been under development for over a year and with its 2013 commercial operation date, will confront the first-of-a-kind risks that the Orlando project was going to

10

bear and help resolve . . . . All of the original project
demonstration objectives will be met with the new site at
no cost increase to the Department. In fact, the objectives
will be exceeded with the new site, since it will allow not
only PRB [Powder River Basin] coal to be tested, but
also lignite. Demonstrating the use of lignite will open up
the opportunity to use this largely underutilized resource
which runs from Texas to Alabama to meet our nation's
energy requirements.

Southern is strongly committed to moving the
project forward and believes the Mississippi site provides
the opportunity for achievement of the Department's
goals for America.

26.    On February 13, 2008, the Chairman, President, and Chief Executive

Officer of Southern, David M. Ratcliffe, submitted to DOE Secretary Bodman a

proposal for the transfer of the Orlando project to Kemper County, Mississippi, to

be discussed at a meeting on February 26, 2008. Mr. Ratcliffe represented to

Secretary Bodman that "[t]he partnership between [DOE] and Southern Company

has already produced the most advanced gasification technology in the world, and

with your continued support, we will commercially demonstrate that capability."

This letter was accompanied by a letter from then-Governor Haley Barbour to

Secretary Bodman, stating his enthusiastic support for the Kemper project, and a

presentation by Southern and MPC titled "Southern Company's Mississippi

11

Project: Answering the Department of Energy's Call to Action" ("February 2018

Presentation").

27.    In the February 2008 Presentation, Southern and MPC represented to

DOE that:

- "Southern Company is prepared to demonstrate the advanced goal gasification technology, TRIG$^{TM}$, in Kemper County, Mississippi."
- "The Mississippi Project has been under development for over a year and was positioned with its 2013 commercial operation date to benefit from the first-of-a-kind risks and costs that the Orlando Project was to bear and help resolve."
- "With the Orlando cancellation, the Mississippi Project . . . now becomes the commercial demonstration of TRIG$^{TM}$, and requires the following assistance from the [DOE] to proceed."
- "The Mississippi Project satisfies the objectives of the original grant [for the Orlando Project] in demonstrating advanced gasification technology and creates greater opportunities for commercialization by demonstrating lignite [coal] as well as PRB [Powder River Basin] [coal]."
- "The Mississippi project site provides a greater chance of commercial success and achievement of [DOE's] goals for America."
- "Southern is pursuing the opportunity to include carbon capture controls beginning in 2013."
- "Southern is developing a strategy for carbon capture of one million tons of $CO_2$ per year at Mississippi with expansion as technology advances."

12

- "The Mississippi project can become the commercial demonstration site for our carbon capture research [DOE] and Southern are performing at our Power Systems Development Facility, PSDF."
- "[TRIG's] introduction into the marketplace with CCS [carbon capture and sequestration] capability can be a reality in 2013 with [DOE's] continued support of Southern Company's Mississippi Project."

28.     The February 2008 Presentation contained a "Project Overview" which stated, among other things: "In-service Date – 6/1/2013." It also contained a "Project Schedule" indicating that construction would be completed on or before December 31, 2012, and that start-up and testing would be completed by the end of June 2013. Finally, Southern and MPC requested in the February 2018 Presentation that DOE waive their obligation to repay the DOE funds contributed to the Orlando Project.

29.     In a March 13, 2008 letter, MPC's President and Chief Executive Officer told DOE Secretary Bodman, "With your support, we can receive state certification to build this first of a kind TRIG$^{TM}$ plant with carbon capture technology and do it by 2013." A document attached as Exhibit 3 to this letter stated: "In-service date: June 1, 2013."

30.     The Director of the National Energy Technology Laboratory ("NETL"), a division of DOE, submitted a memorandum on April 22, 2008, to

13

high-ranking DOE officials requesting authority to approve a modification of the

agreement with SCS to change the site of the demonstration project from Orlando

to Kemper County, Mississippi, and a Secretarial waiver of Southern's obligation

to repay DOE's contributions to the project. The Director based his

recommendations on "the continued programmatic need to demonstrate Southern's

gasification technology at commercial scale . . . ."

31.     On January 16, 2009, MPC applied to the Mississippi Public Service

Commission ("MPSC") a state utility regulatory body, for permission to build the

Kemper Plant ("Kemper"), a proposed "integrated gasification combined cycle"

facility. Kemper was to run on lignite coal mined locally. The coal would be

gasified, the gas burned to generate electricity, and much of the resulting carbon

dioxide captured and sequestered.

32.     The MPSC approved the Kemper Plant on April 29, 2010, but

imposed certain restrictions, including a cost cap that limited the construction costs

MPC could charge to ratepayers to $2.4 billion, which was raised shortly thereafter

to $2.88 billion.

33.     On August 12, 2010, DOE issued a 50-page Record of Decision,

based on Defendants' representations, authorizing $270 million in DOE funds for

14

the Kemper Plant Project, allocating $245 million for construction and the remaining $25 million to be provided after the plant's completion.

34.     The Kemper Plant site broke ground on December 16, 2010.

**Relevant Terms from DOE's Contract with Southern Company**

35.     On December 5, 2008, DOE signed a Financial Assistance Award (FAA) (also sometimes referred to as a "Cooperative Agreement") with Southern Company Services, Inc. for Demonstration of a Coal-based Transport Gasifier in connection with the transfer of the Florida Project to Kemper County, Mississippi. The Total Estimated Project Cost was $1,622,905,779, with DOE providing 18.1% or $293,750,000. It was denominated Amendment A004 to Instrument No. DE-FC26-06NT42391. The FAA provided, among other things, that "DOE shall monitor the Recipient's progress in performing the Project and shall have a substantial role in Project decision making." FAA, section 2.4(b).

36.     The FAA contained a very specific set of requirements that Southern was required to satisfy during the Construction Phase, Phase IIIb, which included plant "construction, installation, commissioning, and startup," among other activities. For example, paragraph 3.1 of the Statement of Objectives in Attachment A covered "Project Management," and stated (emphasis added):

15

> The Project Team will perform all project management
> activities (i.e., planning, tracking, executing, controlling,
> and communicating) **necessary to assure technical,
> cost, and schedule goals per the Cooperative
> Agreement.** The technical, **cost, and schedule
> information will be updated.**

37.    Southern was required to report on a wide variety of parameters and

milestones leading up to completion of the project. Section E of the attachment

stated: "[Southern] shall provide reports in accordance with the enclosed Federal

Assistance Reporting Checklist and the instructions accompanying the Checklist."

The Checklist was contained in Attachment B to the FAA. Among other reports,

Attachment B required a "Progress Report," a "Special Status Report," and a

"Financial Status Report" to be provided to DOE. The Instructions portion of

Attachment B described in detail the information required to be included in these

reports.

38.    In the Progress Report, Southern was obligated to contain "a concise

narrative describing the current status of work. The report allows Recipients [i.e.,

Southern] to communicate developments, achievements, changes and problems [to

DOE]." Among other things, in point no. 10, this report was mandated to disclose:

> [a]ctual or anticipated problems or delays and
> actions taken or planned to resolve them. **Identify**

16

> **any event causing a significant schedule
> slippage or cost growth**; an environmental, safety,
> or health violation; or the achievement of or
> problems encountered for an important
> performance objective. [Emphasis added.]

39.     As part of the Special Status Reports, Southern was required to email

the DOE Project Officer (defined to be the functional equivalent of the Contracting

Officer's Technical Representative) as soon as possible notice of any of the

following:

> Problems, delays, or adverse conditions which
> materially impair the recipient's ability to meet the
> objectives of the award [including] [a]ny event
> **which is anticipated to cause a significant
> schedule slippage or cost increase**. [Emphasis
> added.]

40.     The Financial Status Report, submitted via a Standard Form 269 or

269A was to reflect:

> regular periodic accounting of project funds
> expended. The accounting may be on either a cash
> or accrual basis. Actual total expenditures and
> obligations incurred, but not paid, are reported for
> each reporting period for each major activity.
> Provision is made to identify the Federal and
> non-Federal share of project outlays for each
> identified activity.

17

41.    Attachment A in Section H stipulated that project management meetings were to be held weekly or on an as-needed basis. The purpose was "to discuss progress, issues, accomplishments, deliverables, milestones, the work plan, press inquiries, upcoming events, etc." including Planned Value and Actual Cost, along with the Expended-to-Date, the Estimate to Complete, and the Estimate at Completion. A DOE representative attended periodic production meetings where the schedule, actual costs, and the estimated costs to complete the project were presented by Southern.

42.    DOE conditioned continued funding on truthful reporting. Section 2.23 of the FAA, titled "Reporting," provided: "**Failure to comply with the reporting requirements contained in this award will be considered a material noncompliance** with the terms of the award. **Noncompliance may result in a withholding of future payments**, suspension or termination of the current award, and withholding of future awards." (Emphasis added.)

43.    Southern's false statements and concealments therefore were material to DOE's decision to pay and continue paying government funds to Southern for the project. Consequently, Southern's invoices constituted false and fraudulent claims to the government.

18

## Disbursement of DOE Funds to Defendants for Kemper's Construction

44.     As reflected in Defendants' filings with the SEC, the $245 million DOE had allocated for construction of the Kemper plant was paid to Defendants in installments beginning in the third quarter of 2010 and ending in the last quarter of 2011.

45.     On or about November 5, 2010, Southern filed its 10-Q Report with the SEC for the quarter ended September 30, 2010. Southern stated, among other things, "[MPC] has been awarded DOE CCPI2 grant funds of $245 million to be used for the construction of the Kemper IGCC and $25 million to be used for the initial operation of the Kemper IGCC. In the third quarter 2010, MPC recorded a receivable of $24.8 million associated with this grant."

46.     On or about May 6, 2011, Southern filed its 10-Q Report for the quarter ended March 31, 2011. Southern stated therein: "As of March 31, 2011, [MPC] had received $40.0 million and requested an additional $20.1 million associated with [DOE's] grant."

47.     On or about August 5, 2011, Southern filed its 10-Q for the quarter ended June 30, 2011. Southern stated in this report: "As of June 30, 2011, [MPC]

had received $111.7 million and requested an additional $11.8 million associated with th[e] [DOE] grant."

48.     On or about November 7, 2011, Southern filed its 10-Q for the quarter ending on September 30, 2011. Therein Southern stated: "[MPC] had received $158.6 million as of September 30, 2011 and subsequently received an additional $20.9 million on October 19, 2011 associated with this grant."

49.     In its 10-K Report to the SEC for December 31, 2011, Southern represented: "Through December 31, 2011, the Company has received grant funds of $245.3 million that were used for the construction of the Kemper IGCC."

## Defendants' False Representations to DOE to Secure the Allocated $245 Million

50.     Even before ground was broken for Kemper in 2010, Defendants were aware that the official cost projections included in the FAA were unachievable. On May 4, 2010, when the Defendants were still representing expected costs to be $2.4 billion, Ed Day, CEO of Southern, sent an internal email explaining that he did not see how Kemper could possibly complete the project for anything less than $2.88 billion. He pointed out that a planned Duke Energy plant that did not include carbon capture technology had a projected cost of $2.9 billion.

51.     Nevertheless, Defendants continued to falsely represent to DOE that the cost was still projected to be $2.4 billion. The false information was provided to DOE during regular Production Meetings attended by a DOE representative. The Production Meetings included an ostensible cost review comprised of a labor report, major equipment report, engineer procured budget and forecast changes, potential budget overruns, an engineered commodities and craft labor production report, the budget cost estimate to date, and budget to actual comparisons, all of which were falsified to conceal the fact that the project would well exceed the $2.4 billion Defendants represented. On information and belief, Defendants also submitted the same false information in written reports to DOE, and Defendants did not submit Special Status Reports to DOE as required by FAA Section E and Attachment B to report known cost overruns and amended cost projections.

52.     Defendants' systematic concealment of its cost projections for Kemper is also reflected in Defendant Southern Company's SEC filings. For example, in its annual Form 10-K for 2011, Southern falsely maintained that the "estimated cost of the plant is $2.4 billion." By contrast, Defendants were internally predicting costs of $3 billion at that time.

21

53.     While Defendants were making knowingly false representations to DOE, DOE was paying out the $245 million allocated for Kemper's construction in installments. By April 2011, roughly $60 million had been paid out, and by June 2011, roughly $111 million had been paid out, leaving roughly $134 to be paid after June 2011. By the end of 2011, DOE had provided the entire $245 million to Defendants.

54.     Had DOE been aware that Defendants were not complying with the FAA's reporting requirements and were instead intentionally misrepresenting the status and outlook for the Kemper Project, DOE would not have released these funds, as was its right under Section 2.23 of the FAA.

55.     After receiving the $245 million in CCPI funds, Defendants continued their misrepresentations about their cost projections for Kemper. Examples include:

- On April 25, 2012, Defendant Southern Company held a conference call for analysts, media representatives and investors during which the company forecasted a summer 2013 startup date for the Kemper Plant, stating:

  > Initial startup and testing are now only 14 months away.
  > And we remain confident that this project will provide
  > the best value to customers over the long term. Targets

> remain achievable for . . . the . . . Kemper County
> project[] with regard to construction schedule and cost to
> customers.

- On August 9, 2012, MPC issued a press release announcing that the Kemper Plant would be operational by May 2014.

- On September 13, 2012, MPC issued a press release announcing that the Kemper Project was approximately 50% complete and should begin powering Mississippi homes and businesses in May 2014.

- On October 19, 2012, MPC announced that the Kemper Plant was on schedule for a May 2014 completion date and was 70% complete, and that new effluent pipes and transmission equipment were completed ahead of schedule.

56.     To justify its official, false projections, Defendant Southern, through Thomas Anderson, MPC's VP of Generation Development, instructed Relator and others to cut their budgets to levels that were not achievable but would not raise alarms to those outside the company. Relator was required to estimate construction costs in many categories at lower levels than Southern had ever achieved on any past project. Relator was also instructed to exclude previous predictions from her estimates to conceal that unexplained cuts had been made to her budget.

57.     Defendants' ongoing deceptions and failure to admit their past systematic concealments permitted Defendants to remain eligible for future additional DOE funding. If DOE had known that Defendants were not meeting

23

their reporting requirements and/or that they were submitting knowingly false and fraudulent reports, Defendants would have been deemed ineligible for future allocations. Had DOE learned that Defendants were knowingly engaging in a deceitful and fraudulent course of conduct vis-à-vis DOE, regulators, the SEC, and the public, DOE would have deemed the defendants to lack the integrity and level of responsibility warranting DOE's continuing contribution of hundreds of millions of dollars of taxpayers' funds to their project.

58.   Additionally, Defendants took actions in 2012 that demonstrated their cognizance that the information they provided on Kemper in 2011 was false and in essence constituted an attempt to hide that they had ever internally projected much higher costs.

59.   Consequently, for the reasons described above, Defendants knowingly presented, or caused to be presented, to an officer or employee of the United States, false or fraudulent claims for payment or approval, i.e., the claims for the DOE funding described above, and/or Defendants knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim for payment or approval by the United States Government and/or to conceal an obligation to pay money to DOE.

24

## DOE's 2016 Funding of Kemper and Defendants' Additional False Statements

60.     In Section 313 of the Congress's 2016 Consolidated Appropriations Act, Congress mandated that DOE reallocate $160 million in funds from energy projects that did not get off the ground to become viable clean coal projects.

61.     DOE identified two such projects: Kemper and Petra Nova, a clean coal project underway in Houston, Texas. DOE announced that it would provide $137 million to Kemper and $23 million to Petra Nova, while providing Petra Nova with an additional $167 million from other sources.

62.     In conjunction with announcing the new funding, DOE relied on Defendants' false representation that Kemper would be fully operational by the end of 2016. Defendants received the $137 million grant in April 2016 as a result.

63.     In reality, Defendants knew that Kemper was not on track to be operational in 2016. Defendants also were aware that their official projections for the Kemper Plant's "availability" once operational—meaning the number of hours per year it could run and thus the amount of energy it could produce—were false. Defendants concealed an availability analysis that they had commissioned until after the DOE funds were paid in April 2016.

64.     Had DOE known the true state of the Kemper Project, the agency would have recognized that the project was not viable and would not have allocated the additional $137 million to the project. Those funds would instead have been allocated to Petra Nova, which in fact began operating a clean coal plant as scheduled in January 2017.

65.     Defendants' false representations about the viability of Kemper resulted in DOE providing this additional $137 million in funding and therefore constitute false claims and/or Defendants, by submitting those false representations, knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim for payment or approval by the United States Government.

### Count I – False Claims Act, 31 U.S.C. §§ 3729(a)(1)(A) and (a)(1)(B)

66.     Relator incorporates each paragraph of this Complaint as if fully set forth herein.

67.     As described above, Defendants knowingly presented, or caused to be presented, to an officer or employee of the United States, false or fraudulent claims for payment or approval, in violation of 31 U.S.C. § 3729(a)(1)(A).

68.     As described above, Defendants knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim for payment or approval by the United States Government, in violation of 31 U.S.C. § 3729(a)(1)(B).

69.     As a result of these claims, the United States Government paid Defendants and suffered damages to be determined at trial.

### Count II – False Claims Act, 31 U.S.C. §§ 3729(a)(1)(G)

70.     Relator incorporates each paragraph of this Complaint as if fully set forth herein.

71.     As described above, Defendants knowingly made, used, or caused to be made or

used, false records and statements material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided and decreased an obligation to pay or transmit money or property to the Government, inasmuch as DOE's agreement to waive Defendants' obligation to repay to DOE the funding DOE contributed to the Kemper Project would, by the terms of the Cooperative Agreement, have become void because the Defendants did not, with respect to the planned coal-fired power plant in

27

Mississippi receiving CCPI Round II funds: (a) design, build, and operate the

facility with the intent to capture and geologically sequester by enhanced oil

recovery or otherwise one million tons per year of $CO_2$ (approximately 25%

capture rate); and (b) establish, and actively work toward, the goal of capturing and

sequestering 50% of $CO_2$ emissions from the plant by 2020 and thereafter. To the

contrary, Defendants knew that they could not achieve the goal of capturing and

sequestering 50% of $CO_2$ emissions from the plant by 2020 and thereafter.

## Count III – False Claims Act, 31 U.S.C. §§ 3729(a)(1)(G)

72.     Relator incorporates each paragraph of this Complaint as it fully set
forth

herein.

73.     As described above, Defendants knowingly made, used, or caused to
be made or

used, false records and statements material to an obligation to pay or transmit

money or property to the Government, or knowingly concealed or knowingly and

improperly avoided and decreased an obligation to pay or transmit money or

property to the Government, inasmuch as Defendants avoided repayment of the

loan in connection with the Florida project and OUC facility through the use of

28

false statements and/or records.

## Count IV – False Claims Act, 31 U.S.C. § 3730(h)

74.     Relator incorporates each paragraph of this Complaint as if fully set
forth herein.

75.     Relator was retaliated against for reporting to her superiors at the
Defendant
companies including her employer, Southern Company, her objections about the
false information Defendants were supplying to the public and state and federal
governmental entities, including DOE. As a result, Relator was excluded from
management meetings and eventually demoted.

76.     Additionally, Relator was given an "exceeds expectation" review
rating by her manager in a year-end performance review. However, before the
reviews were finalized, Relator's manager was told to change her review to her a
lower rating. The manager provided her with no other explanation for this
retaliatory action other than that it was related to the Kemper project.

77.     Through this conduct, Defendants violated 31 U.S.C. § 3730(h), and
Relator is entitled to all appropriate relief as provided in § 3730(h)(2).

## Jury Trial Demanded

The United States of America, on the relation of Kelli Williams, hereby demands trial by jury on all issues so triable.

WHEREFORE, Relator Kelli Williams respectfully requests that the Court enter judgment in her favor and in favor of the United States of America, awarding treble damages, penalties, and all appropriate relief for violations of the False Claims Act, and awarding Relator Kelli Williams thirty percent of the government's recovery as well as costs and attorney fees.

Respectfully submitted,

*/s/ Zack Greenamyre*
Zack Greenamyre
Georgia Bar No. 293002
Mitchell & Shapiro LLP
3490 Piedmont Road, Suite 650
Atlanta, Georgia 30305
404-812-4751
404-812-4740 (fax)
zack@mitchellshapiro.com

*/s/ Mike Kanovitz*
Mike Kanovitz1
Illinois Bar No. 6275233
*/s/ Frank Newell*
Frank Newell
Illinois Bar No. 6290332
*/s/ Julia Rickert*
Julia Rickert
Illinois Bar No. 6302842

---

1 Upon filing, attorneys will file proper motion for admission *pro hac vice*.

Loevy & Loevy
311 N. Aberdeen Street, 3rd Floor
Chicago, IL 60607
Ph: (312) 243-5900

*/s/ Jack Kolar*
Jack Kolar
District of Columbia Bar No. 292953
*/s/ Karen Gray*
Karen Gray
District of Columbia Bar No. 488760
Government Accountability Project
1612 K Street, N.W.
Suite 1100
Washington, DC 20006
Ph: (202) 457-0034

*Attorneys for Relator Kelli Williams*

31