IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* ) <br><br> KELLI WILLIAMS, ) <br><br>  Plaintiff-Relator, ) <br><br>  v. ) <br><br> THE SOUTHERN COMPANY, INC., ) <br> SOUTHERN COMPANY SERVICES, INC., ) <br> and MISSISSIPPI POWER COMPANY, ) <br><br>  Defendants.  ) <br> ) <br> ) | CIVIL ACTION NO. <br> 1:18-CV-0680-SCJ <br><br><br> Judge Steve C. Jones <br><br><br> Jury Trial Demanded |

## AMENDED COMPLAINT

NOW COMES the UNITED STATES OF AMERICA *ex rel.* KELLI WILLIAMS, by and through their undersigned attorneys, Loevy & Loevy and the Government Accountability Project, and complaining of Defendants THE SOUTHERN COMPANY, INC., SOUTHERN COMPANY SERVICES, INC., and MISSISSIPPI POWER COMPANY (collectively, "Defendants"), states as follows:

## INTRODUCTION

1.      This action seeks damages and civil penalties arising from violations of the False Claims Act, 31 U.S.C. §§ 3729, *et seq.*

2.      Defendants are electricity companies that engaged in fraud against the United States in connection with grants from the U.S. Department of Energy ("DOE") for the

construction of Plant Ratcliffe, commonly known as the "Kemper Project" or "Kemper," a now-defunct "clean coal" power plant in Kemper County, Mississippi. The DOE is an agency of the United States Government responsible for ensuring the nation's energy security.

3.      In 2010 and 2011, DOE provided roughly $245 million to fund the Kemper Project as part of the Clean Coal Power Initiative. In 2016, DOE provided almost $137 million of additional monies to fund Kemper. The DOE funding of Kemper was provided under a contract known as a cooperative agreement.

4.      Pursuant to the contract, Defendants undertook to build a power plant running on a low-ranked coal called lignite to demonstrate the feasibility and commercial viability of a supposed "clean coal" process known as Transport Reactor Integrated Gasification ("TRIG"). This plant was to use gasified lignite coupled with carbon-capture and sequestration technology.

5.      The completed Kemper Project was supposed to provide good jobs at the plant and in the nearby lignite mine to some of the poorest workers in the country. It was also to provide more affordable, reliable electricity to some of the country's poorest ratepayers.

6.      Kemper represented that it could complete the project by 2014 for a cost of $2.4 billion, net of the first round of DOE funding. To ensure DOE funding and support, as well as state regulatory approval, Defendants repeatedly assured DOE and state regulators that they were "confident" in their cost estimates for Kemper.

7.      However, while making these representations externally, Defendants were acknowledging internally, even before ground was broken in December 2010, that they were not

confident in their estimates. Moreover, they knew that the DOE funding was necessary to the economic viability of the project and was necessary for obtaining state regulatory approval.

8.      As part of their contract, Defendants represented that they were presenting and would continue to present DOE with accurate information about the status of the Kemper Project. They also stated that they were alerting and would continue to alert DOE as soon as possible to increases in cost estimates, schedule slippage, and any other significant setbacks.

9.      However, throughout the project, Defendants knowingly made material false statements in their quarterly reports to DOE regarding the plant's cost, status, and commercial viability. Specifically, while the initial $245 million in DOE funding for Kemper was being disbursed throughout 2010 and 2011, Defendants knowingly made false statements to DOE in quarterly reports that the project was "on schedule" and "on budget," thereby concealing cost overruns and delays that were already plaguing Kemper. These assurances, falsely made, were a requirement for Kemper to receive disbursements under the contract. They also concealed Defendants' failure to comply with the special reporting requirements of the cooperative agreement that were triggered by these overruns and delays.

10.      To support these false statements, Defendants also created and presented false cost-estimate documents to DOE representatives, intending to mislead the agency. Kemper created these documents through a process that bore no resemblance to the normal budgeting process the government expected, but which was instead designed to conceal that costs at Kemper were ballooning.

11.     Defendants also certified on their requests for disbursements to DOE that all funds were spent in accordance with grant conditions. These certifications were knowingly false because Kemper was disregarding the contract's reporting requirements and disguising expenditures to conceal the true state of the project.

12.     Defendants engaged in these deceptions to induce DOE to fund the project, to make periodic disbursements, and to increase the funding. In addition to inducing DOE to make payments, Defendants' misconduct also deprived DOE of the timely, accurate data about the Kemper Project that Defendants had contracted to provide.

13.     At the same time, Defendants were providing similar false information to a state regulator, the Mississippi Public Service Commission ("MPSC"), so that the MPSC would issue, reissue, and not rescind a Certificate of Public Convenience and Necessity ("MPSC Certificate"). The MPSC Certificate was required for the Kemper Project to proceed and was required pursuant to Defendants' contract with DOE.

14.     Defendants lied to the MPSC in several ways. First, Defendants falsely stated to the MPSC that they were confident in their estimates. In fact, Defendants were not confident in their estimates, as reflected in Defendants' internal assessments stating as much. In addition, Defendants falsely represented that Kemper would be able to meet certain performance goals that would make it commercially and economically viable. The reality is that Defendants knew at the time they made these statements that Kemper would not be able to achieve those levels of performance. These false economic calculations were required for Kemper to secure the MPSC Certificate and to later persuade the MPSC not to rescind it.

4

15.     Defendants repeatedly represented to DOE that they had validly obtained the necessary permit (a condition of receiving payment) when, in fact, they were deceiving the MPSC about the cost, status, and commercial viability of Kemper in order to obtain and retain this permit.

16.     Through these false statements to DOE and the MPSC, Defendants were able to achieve their goal of obtaining the first round of DOE funding.

17.     First, the false statements directly caused DOE to disburse money by convincing DOE officials that the Kemper Project was proceeding according to plan and that Defendants were complying with their contractual reporting requirements.

18.     Second, by reporting to DOE that the MPSC Certificate was in place, which was a condition for the release of funds—while failing to reveal that the Certificate was invalid or at least at serious risk due to the dishonest means Defendants used to retain it—Defendants rendered their representations to DOE about the Certificate false. These false representations in turn caused DOE to disburse funds to Defendants.

19.     Third, and relatedly, Defendants falsely induced DOE to maintain its unequivocal support for Kemper to the MPSC. Steady DOE support was an explicit factor in the MPSC's decision to issue and not to rescind the MPSC Certificate. Without the MPSC Certificate, the Kemper Project would have been canceled, and no DOE funding would be disbursed.

20.     Through all of the foregoing false statements, Defendants were able to obtain disbursement of some $245 million in funds that they should never have received.

21.     By 2013, Defendants could no longer conceal that the project was in trouble. It was grossly behind schedule and plagued with cost overruns. So they resorted to new misrepresentations to keep the money flowing. First, Defendants claimed that the cost overruns were the result of unforeseeable circumstances, when, in fact, Defendants had predicted these problems from the inception. The reality was that Defendants, at the highest levels of management, had long foreseen and actively hidden these problems from the DOE and MPSC. Second, they continued to engage in accounting cover-ups and false reporting to minimize the damage and conceal the true extent of the problems. Third, they falsely represented to DOE, to the MPSC, and to the public that the plant would be completed in 2016 and that it remained a commercially and economically viable project.

22.     The campaign of deception worked. Because of these and other false representations, DOE paid Defendants an additional $137 million in 2016. These additional payments were made using funds that Congress had stripped from other failed clean coal projects with the express purpose that the funds be reallocated to viable ones. Had Defendants been honest, then DOE would have known the Kemper Project was not viable and it would not have paid Defendants the additional $137 million.

23.     Another way Defendants lied to make Kemper appear commercially viable was by misrepresenting the plant's expected "availability," a measure referring to the number of hours it would be able to generate electricity per year. Availability is an essential factor in determining a plant's profitability and thus economic viability.

24.     The official availability estimate Defendants produced for Kemper was flawed from the start because it was based on knowingly false premises. For example, the time the plant

would have to be taken offline for certain repairs was represented to be a small fraction of the time Defendants knew such repairs actually would take. Defendants commissioned a new availability analysis as early as 2012, and no later than 2014, that generated a far less favorable availability estimate. But Defendants withheld the new estimate from DOE and the MPSC until after receiving the additional DOE funding in 2016.

25.     The new availability estimate was finally revealed in 2016 after the DOE funds were disbursed. MPSC responded to the revelation by announcing that Kemper's MPSC Certificate would likely be rescinded.

26.     Recognizing that Kemper's MPSC Certificate could not be maintained, in June 2017, Defendants announced that they were abandoning the Kemper Project. By that time, the project had cost $7 billion—$4 billion in cost overruns. The plant was useless as a clean coal facility and could only be run only as a traditional natural gas power plant. Yet Defendants returned no money to DOE.

27.     If DOE had known that Defendants were intentionally deceiving the agency about the state of the Kemper Project and were intentionally withholding accurate data about the project's progress and viability, DOE would have ceased funding and supporting it.

28.     If the MPSC had known the true state of the Kemper Project and the lies that Defendants told in order to obtain and retain the Certificate, it would have never issued the Certificate or would have rescinded it.

29.     Notably, the Sierra Club assesses Kemper to be the most expensive power plant in history based on dollars spent in relation to electricity output. A comparable natural gas power plant could be built for well under $2 billion.

## PARTIES

30.     Relator Kelli Williams began working for Southern Company Services, Inc., in 2006. She served in various positions, including as a Construction Project Manager for the Kemper Project from 2010 to 2013 and in other roles at Kemper from 2015 to 2016. By virtue of her positions with Southern Company on the Kemper Project, Relator was intimately aware of Defendants' schemes and frauds, of which she has direct and independent first-hand knowledge. She repeatedly raised objections to Defendants about the false budget information they were creating and supplying to the public and to state and federal agencies, including DOE. In 2016, Defendant Southern Company demoted Relator in retaliation for the objections she raised, derailing a promising career.

31.     Defendant The Southern Company, Inc. ("Southern Company" or "Southern") is a utility holding company. Southern Company's operating subsidiaries include public utility companies located throughout the Southeastern United States, including Georgia Power, Mississippi Power, Alabama Power, Southern Power, and Gulf Power. Southern Company maintains its headquarters at 30 Ivan Allen Jr. Boulevard, N.W., Atlanta, Georgia 30308. Southern Company's common stock is traded under the ticker "SO" on the New York Stock Exchange.

32.     Defendant Southern Company Services, Inc. ("SCS") is the shared services division of Southern Company and is headquartered in Birmingham, Alabama. Formed in 1963

as Southern Services, the company provides administrative and operational services to all of

Southern Company's operating divisions. SCS also provides engineering services to Alabama

Power, Georgia Power, Gulf Power, and Mississippi Power.

33.     Defendant Mississippi Power Company ("Mississippi Power") is a wholly owned

subsidiary of Southern Company, and is headquartered in Gulfport, Mississippi. Mississippi

Power operates as a vertically integrated utility providing electricity to retail customers within

the State of Mississippi and to wholesale customers in the Southeast.

## JURISDICTION AND VENUE

34.     The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 31

U.S.C. § 3730. The allegations and transactions upon which this action is based have not been

publicly disclosed. Moreover, Relator is an original source within the meaning of 31 U.S.C.

§ 3730(e)(4)(B). Among other things, Relator voluntarily provided information on which the

allegations are based to the federal government, specifically the Department of Justice, before

filing these claims. Venue is proper pursuant to 31 U.S.C. § 3732 because Defendant Southern

Company, Inc. transacts business in this judicial district and acts proscribed by 31 U.S.C. § 3729

occurred in this district.

## FACTUAL ALLEGATIONS

### DOE's Initial Funding of the Kemper Project

35.     In the Energy Policy Act of 2005, Pub. L. 109-58, 119 Stat. 594 (Aug. 8, 2005)

("2005 EPA"), Congress authorized funding to DOE to carry out the "Clean Coal Power

Initiative" ("CCPI"). CCPI was designed to be a government/industry partnership to implement

the President's National Energy Policy recommendation to increase investment in clean coal technology.

36.     Defendant SCS applied to DOE for funding under CCPI Round 2 ("CCPI2") for a clean coal project in Orlando, Florida. The application was submitted on behalf of a team consisting of SCS, Southern, the Orlando Utilities Commission ("OUC"), and Kellogg Brown & Root ("KBR"), and sought $235 million of DOE funds to partially finance a Demonstration Plant in Orlando, Florida, co-owned by Southern and OUC ("Orlando Demonstration Plant").

37.     According to the application, the purpose of the project was "[d]emonstration of an air-blown integrated gasification combined cycle (IGCC) power plant based on [a] transport gasifier." The transport gasifier was to be based on KBR's catalytic cracking technology. The application asserted: "The transport gasifier offers a simpler and more robust method for generating power from coal than other alternatives. It is unique among coal gasification technologies in that it is cost-effective when handling low-rank coals when using coals with high moisture or high ash content."

38.     In January 2006, DOE awarded a cost-shared cooperative agreement to Southern for the full-scale demonstration of the KBR-developed TRIG™ technology at the Southern facility in Orlando. The initial project cost was estimated to be $568 million with a DOE/Southern split of $235/$333 million. The agreement was amended in March 2007 to increase the cost estimate to $844 million with a DOE/Southern split of $293/$551 million. The money was to be provided as a loan.

39.     While project work proceeded in Orlando in December 2006, Southern's subsidiary Mississippi Power and Mississippi Governor Haley Barbour (a former Southern

Company lobbyist) announced that they were considering construction of a $1.8 billion coal gasification plant in Kemper County, Mississippi, based on the same technology as the Orlando project. The president of Mississippi Power announced: "There are a lot of gasification technologies out there. We don't believe any of them measure up to the technology we have developed and are now prepared to go commercial with."

40.     Shortly after the announcement of the Kemper Project, the Orlando Demonstration Project was shelved. In January 2007, a new administration had taken office in Florida that did not support coal-based power production without carbon capture and sequestration ("CCS"), and project economics and distance to carbon dioxide storage sites made CCS impossible for Orlando. Consequently, Southern and OUC could not obtain the necessary permits.

41.     After the January 2007 Orlando cancellation, Southern wrote to DOE to request that the agency transfer the remaining CCPI2 funding for the Orlando Demonstration Plant—approximately $270 million—to the project in Kemper County, Mississippi. The letter represented to DOE that front-end engineering and design effort for Kemper was underway "to support commercial operation in June 2013."

42.     During the 2007–08 period, Southern continued seeking transfer of the CCPI2 funds from Orlando to Kemper. In February 2008, Southern and Mississippi Power requested a meeting in February 2008 with the DOE Secretary Samuel Bodman "to discuss allowing the remaining Clean Coal Power Initiative funding for Cooperative Agreement DE-FC26-06NT42391 to be used for an integrated gasification combined-cycle (IGCC) demonstration project in Kemper County, Mississippi." The request repeated the representation that the then

11

ongoing front-end engineering and design work on the Kemper County project would "support commercial operation in June 2013."

43.     The same month, Thomas A. Fanning, the Chief Operating Officer ("COO") of Southern, also wrote to the Director of DOE's National Energy Technology Laboratory to request that DOE approve the relocation of the project to Kemper County. In this letter, Mr. Fanning assured DOE that, at Kemper, "[a]ll of the original project demonstration objectives will be met with the new site at no cost increase to the Department."

44.     Shortly thereafter, the Chairman, President, and Chief Executive Officer of Southern, David M. Ratcliffe, submitted a formal proposal to DOE Secretary Bodman for the transfer of the Orlando funds to the Kemper Project, to be discussed at a meeting on February 26, 2008. Mr. Ratcliffe represented to Secretary Bodman that "[t]he partnership between [DOE] and Southern Company has already produced the most advanced gasification technology in the world, and with your continued support, we will commercially demonstrate that capability." This proposal was accompanied by a letter from Gov. Haley Barbour to Secretary Bodman, stating his enthusiastic support for the Kemper Project, as well as by a presentation by Southern and Mississippi Power titled "Southern Company's Mississippi Project: Answering the Department of Energy's Call to Action" ("February 2008 Presentation").

45.     In the February 2008 Presentation, Southern and Mississippi Power represented to DOE that the agency's support was crucial and that, with DOE support, the project could be a commercial success.

46.     Mississippi Power's President and Chief Executive Officer wrote to Secretary Bodman in a March 2008 letter, "With your support, we can receive state certification to build

this first of a kind TRIG™ plant with carbon capture technology and do it by 2013." A document attached as Exhibit 3 to the letter stated: "In-service date: June 1, 2013."

47.     Carl Bauer, the Director of the National Energy Technology Laboratory ("NETL"), a division of DOE, submitted a memorandum on April 22, 2008, to high-ranking DOE officials requesting authority to approve a modification of the agreement with SCS to change the site of the demonstration project from Orlando to Kemper County, Mississippi. The Director based his recommendations on a "need to demonstrate Southern's gasification technology at commercial scale" and the assessment that Southern's financing plans were "reasonable."

48.     The memo also addressed Southern's request for a Secretarial waiver of its obligation to repay DOE's contributions to the project. Bauer recommended granting that request as well, noting that approval of the project from the MPSC was unlikely without the waiver because the project would not be a cost-effective option without it.

49.     On May 22, 2008, Secretary Bodman granted NETL the authority to approve Southern's requests. Regarding the repayment waiver, Bodman explained that, although DOE had not granted such waivers previously and was concerned that other CCPI recipients would expect waivers if Southern's request were granted, waiver was necessary. Without it, he explained, the economics of the project would be adversely affected, jeopardizing MPSC approval because the MPSC required the project's economic feasibility to protect the ratepayers.

## State Regulatory Approval

50.     Mississippi Power applied to the MPSC in January 2009 for permission to build the Kemper Plant, a proposed "integrated gasification combined cycle" facility. The plant was to

run on lignite coal, a "low-rank" (*i.e.*, low-quality) coal, mined locally. The coal would be gasified to create "syngas" (short for "synthesis gas"), and the syngas would be burned to generate electricity. Roughly 50% of the carbon dioxide the plant produced would be captured and sequestered.

51.     The MPSC preliminarily approved the Kemper Project on April 29, 2010. The project's official cost estimate at that time was $2.4 billion, net of expected government incentives. The Commission expressed some concern about the cost.

52.     Seeking to help Defendants assuage the MPSC commissioners' lingering concerns, the Secretary of Energy sent a letter to the commissioners in May 2010 explaining that DOE had reviewed Southern's submissions and concluded the project would be economically viable with the requested federal support. The letter stressed that the "project is of national importance because it provides a viable option for using our abundant coal resources in a cost-effective and clean manner and for reducing power plant emissions," highlighting the importance of Kemper's supposed cost-effectiveness to DOE's decisions.

53.     Neither DOE nor the MPSC knew that, also in May 2010, Mississippi Power CEO Ed Day was internally sounding the alarm to company leadership—both in writing and orally—about the inaccuracy of the official cost estimate for Kemper.

54.     The MPSC went on to give final approval for Kemper at the end of May 2010, issuing the Certificate in June. But the MPSC imposed certain restrictions as part of the Certificate.

55.     One condition was a cost cap that limited the construction costs Mississippi Power could recover from ratepayers (some of the most economically disadvantaged consumers

in the country) to $2.88 billion. This amount was 20% over the $2.4 billion estimate (the "Certified Cost Estimate") to allow some room for error.

56.      Another condition was that "the cost to ratepayers from operating the Kemper IGCC Project must not exceed the costs associated with the operational assumptions in MPC's original filing (specifically, the assumptions concerning availability factor, heat rate, lignite heat content, and by-product revenues)." In Mississippi Power's filing with the MPSC, "[a]vailability is defined as the total number of operation hours on syngas divided by 8,760 hours [i.e., the total number of hours in a year]." The availability estimate at the time of certification was 59% in the first year, ramping up to 85% by year five, and reaching 89% by year eight (the "Certified Availability Estimate").

57.      The MPSC also explained that the Certified Cost Estimate of $2.4 billion assumed the availability of certain federal incentives (e.g., CCPI2 funds). If those incentives were to fall through, the order specified, Mississippi Power would be able to recover that lost funding from ratepayers only if the company "made best efforts to procure the incentive before it became unavailable."

58.      On August 12, 2010, DOE issued a 50-page Record of Decision, authorizing $270 million in DOE funds for the Kemper Project based on Defendants' false representations about the project's estimated cost, schedule, and performance. $245 million was allocated for construction, and the remaining $25 million was to be provided after the plant's completion. The Record of Decision reiterated that DOE chose Kemper over other projects because of the representations that Defendant had the capability to "demonstrate a technology that can use the nation's abundant coal resources in a *cost-effective* and clean manner" (emphasis added).

59.     Mississippi Power broke ground at the Kemper site on December 16, 2010, during an invitation-only ceremony. Gov. Haley Barbour spoke, reportedly exclaiming that the "Left says clean coal doesn't exist—this is it!" Southern CEO Thomas Fanning (who succeeded former CEO Ratcliffe) also spoke, telling the crowd, "We believe, with all the issues facing coal in America, this technology is the way forward to preserve the United States' most plentiful energy resource."

60.     Meanwhile, the Sierra Club had filed a lawsuit challenging the sufficiency of the factual basis for MPSC's issuance of Kemper's MPSC Certificate. The Mississippi Supreme Court ultimately agreed with the Sierra Club and remanded the case to the MPSC for reconsideration of its decision.

61.     The MPSC reevaluated Kemper and, in a lengthy April 2012 order, approved the project once more. On remand, Defendants had stuck by the Certified Cost Estimate and Certified Availability Estimate, and the MPSC noted that the Company "testified that it is confident in its estimates."

62.     The MPSC Certificate was necessary for Kemper to go forward and was necessary for the project to receive DOE funding. *See* "Notice of Financial Assistance Award" section 2.29 at 12; *see also* "Notice of Financial Assistance Award Attachment A" section D.iii. at 39. To gain the support of both DOE and the MPSC, the company stressed again and again that Kemper would be commercially viable and cost-effective. DOE and the MPSC, in turn, cited these factors as reasons for their continuing support of the project.

**Relevant Terms from DOE's Contract with Southern Company**

63.     DOE's Cooperative Agreement ("Agreement") (also referred to as a Financial Assistance Award, or FAA) with Southern Company Services, Inc. was for the "Demonstration of a Coal-based Transport Gasifier" in Kemper County, Mississippi. The Agreement was denominated "Amendment A004 to Instrument No. DE-FC26-06NT42391," and it transferred the remaining funds from the Orlando Demonstration Project to the Kemper Project. The Total Estimated Project Cost was initially $1,622,905,779,[1] with DOE providing 18.1%, or $293,750,000 (a number that included funds already expended in Florida). In September 2010, the Total Estimated Project Cost was revised in Modification 007 of the Agreement to $2,065,013,164, based on updated budget numbers submitted by Southern.

64.     The Agreement provided that "DOE shall monitor the Recipient's progress in performing the [Kemper] Project and shall have a substantial role in Project decision making." § 2.4(b). To enable this participation, the Agreement included terms requiring Southern to collect certain information and provide it to DOE.

65.     Paragraph 3.1 of the Statement of Objectives in Attachment A to the Agreement, which covered "Project Management," required Southern to monitor the project carefully and track its progress:

> The Project Team will perform all project management activities (i.e., planning, tracking, executing, controlling, and communicating) necessary to assure technical, cost, and schedule goals per the Cooperative Agreement. The technical, cost, and schedule information will be updated.

---

[1]     According to the April 2008 memo from NETL director Carl Bauer, this number did not include Southern's labor costs, finance charges, or the cost of CCS, estimated to be $250 million. The memo further explained that Southern was excluding labor costs to reduce certain accounting costs but would still be required to report to DOE on the cost of labor.

17

66.     Section 2.5 (d) unambiguously required Southern to report and explain any

anticipated cost overruns to DOE right away and in writing:

> The Recipient shall immediately notify the Contracting
> Officer in writing whenever it becomes apparent that the
> costs of completing that portion of the Project to be
> performed during a Budget Period exceeds the Total
> Approved Budget. Such written notice shall, at a minimum,
> set forth (1) a detailed explanation of the magnitude and
> factors causing the cost overrun and (2) the Recipient's
> proposed plan to fund the increased cost.

67.     Additionally, Southern was required to "provide reports in accordance with the

enclosed Federal Assistance Reporting Checklist and the instructions accompanying the

Checklist," which was contained in Attachment B to the Agreement. Among other reports,

Attachment B required "Progress," "Special Status," and "Financial Status" reports to be

provided to DOE. The Instructions portion of Attachment B describes in detail the information to

be included in these reports.

68.     In each Progress Report, Southern was obligated to provide "a concise narrative

describing the current status of work." The purpose of the reports was for Southern "to

communicate developments, achievements, changes and problems" to DOE. Among other

things, in point no.10, this report was to disclose:

> [a]ctual or anticipated problems or delays and actions taken
> or planned to resolve them. **Identify any event causing a
> significant schedule slippage or cost growth**; an
> environmental, safety, or health violation; or the
> achievement of or problems encountered for an important
> performance objective.

(Emphasis added).

69.     As part of the Special Status Reports, Southern was required to email the DOE

Project Officer (defined to be the functional equivalent of the Contracting Officer's Technical

Representative) as soon as possible notice of any of the following:

> Problems, delays, or adverse conditions which materially impair the recipient's ability to meet the objectives of the award [including] [a]ny event **which is anticipated to cause a significant schedule slippage or cost increase**.

(Emphasis added).

70. The Financial Status Report, submitted via a Standard Form 269 or 269A was to

reflect:

> regular periodic accounting of project funds expended. The accounting may be on either a cash or accrual basis. Actual total expenditures and obligations incurred, but not paid, are reported for each reporting period for each major activity. Provision is made to identify the Federal and non-Federal share of project outlays for each identified activity.

71.     Attachment A in Section H stipulated that project management meetings were to

be held weekly or on an as-needed basis. The purpose was "to discuss progress, issues,

accomplishments, deliverables, milestones, the work plan, press inquiries, upcoming events,

etc.," including Planned Value and Actual Cost, along with the Expended-to-Date, the Estimate

to Complete, and the Estimate at Completion. A DOE representative attended periodic

production meetings where the (falsified) schedule, actual costs, and the estimated costs to

complete the project were presented by Southern.

72.     DOE conditioned continued funding on truthful reporting. Section 2.23 of the

Agreement, titled "Reporting," provided:

> **Failure to comply with the reporting requirements contained in this award will be considered a material**

> **noncompliance** with the terms of the award. **Noncompliance may result in a withholding of future payments**, suspension or termination of the current award, and withholding of future awards.

(Emphasis added).

73.   DOE also required under Section 2.1 that the "Project Team shall perform all project management activities (*i.e.*, planning, tracking, executing, controlling, and communicating) necessary to meet technical, cost, and schedule goals per the Cooperative Agreement."

74.   Section 1.4 of Attachment A makes clear that receiving accurate information is part of DOE's bargain with Southern by requiring the Project Team to

> develop a commercialization strategy to market the TRIG™ technology (i) by identifying the applicable coal-based markets in different geographic regions of the world, and (ii) by developing 'TRIG™ Technology User Groups' for later dissemination of information on the demonstrated benefits of efficiency, environmental emissions, and cost compared with competing IGCC technologies for coal-based electricity generation. This strategy will include site visits for stakeholders interested in the technology.

75.   The Cooperative Agreement also required Defendants to obtain all necessary permits for the construction of Kemper. *See* "Notice of Financial Assistance Award" section 2.29 at 12; *see also* "Notice of Financial Assistance Award Attachment A" section D.iii. at 39.

### **Initial Disbursement of DOE Funds for Kemper's Construction**

76.   As reflected in Defendants' filings with the SEC, the $245 million that DOE had allocated for construction of the Kemper plant was paid to Defendants in installments beginning in the third quarter of 2010 and ending in the last quarter of 2011 (the "Initial Disbursement Period").

77.     On or about November 5, 2010, Southern filed its 10-Q Report with the SEC for the quarter ended September 30, 2010. Southern stated, among other things, "[Mississippi Power] has been awarded DOE CCPI2 grant funds of $245 million to be used for the construction of the Kemper IGCC and $25 million to be used for the initial operation of the Kemper IGCC. In the third quarter 2010, [Mississippi Power] recorded a receivable of $24.8 million associated with this grant."

78.     On or about May 6, 2011, Southern filed its 10-Q Report for the quarter ended March 31, 2011. Southern stated therein: "As of March 31, 2011, [Mississippi Power] had received $40.0 million and requested an additional $20.1 million associated with [DOE's] grant."

79.     On or about August 5, 2011, Southern filed its 10-Q for the quarter ended June 30, 2011. Southern stated in this report: "As of June 30, 2011, [Mississippi Power] had received $111.7 million and requested an additional $11.8 million associated with th[e] [DOE] grant."

80.     On or about November 7, 2011, Southern filed its 10-Q for the quarter ending on September 30, 2011. Therein Southern stated: "[Mississippi Power] had received $158.6 million as of September 30, 2011 and subsequently received an additional $20.9 million on October 19, 2011 associated with this grant."

81.     In its 10-K Report to the SEC for December 31, 2011, Southern represented: "Through December 31, 2011, the Company has received grant funds of $245.3 million that were used for the construction of the Kemper IGCC."

## Defendants' Internal Cost Estimates

82.     Defendants outwardly expressed great confidence in their official cost estimates for Kemper, both to DOE and the MPSC. But Defendants knew their estimates were not accurate

or reliable. Even before the DOE disbursements began and before ground was broken at the end of 2010, Defendants knew that the Certified Cost Estimate of $2.4 billion would not be achievable. They even knew that building Kemper for $2.88 billion—the amount of the MPSC cap on recoverable costs—was unrealistic.

83.    This knowledge is documented, *inter alia*, in a May 4, 2010, email that Mississippi Power CEO Ed Day sent to his team. As Defendants continued to represent to DOE and others that they had confidence in their cost estimate of $2.4 billion for Kemper, Day wrote to his team questioning the reality of the estimate, giving as an example the fact that Duke Energy was projecting $2.9 billion to construct a plant which *did not include carbon capture technology*.

84.    Day also noted that he had shared his beliefs about the budget errors with Thomas Anderson, Mississippi Power's Vice President of Generation Development. But, on information and belief, Day's well-founded concerns were not shared with DOE or the MPSC.

85.    To come up with their unrealistic cost estimate for Kemper, Defendants had eschewed the normal estimating process that Southern employed for every other construction project and which DOE expected it to use for Kemper. Rather than having the Project Controls Department undertake the initial estimate, as would have been usual, Southern gave the Gasification Department that task, a reckless or intentional maneuver to reallocate the estimating process from the disinterested professionals to those who had a direct stake in the outcome. Management understood that the Gasification Department, headed by Randall Rush, had an incentive to paint a false, rosy picture in order to get approval for Kemper, a massive

Gasification Department project. Sidelining Project Controls to get a more favorable estimate rendered those estimates reckless at best.

86.     To paint that false picture, the Gasification Department's estimate employed deeply flawed assumptions.

87.     For example, any cost estimate for the construction of a power plant must account for how much manpower will be needed to hang each ton of steel, but Southern plugged in numbers that could not be accurate for a project of Kemper's size and height. Those numbers might have been accurate for structures much shorter than Kemper, but steel becomes far less efficient to hang as a structure gets taller, both because hanging steel up high is more difficult and because lighter steel is used (reducing the weight of the steel that is hung per man hour). This reality was well known to Defendants.

88.     Defendants also knew of additional manipulations in their cost estimates.

89.     One such maneuver involved the amount of earth that would need to be moved for the plant. Mass grading occurs at the earliest stages of a project like Kemper and involves the movement of earth in preparation for the final grading, or construction phase, of the project. A LIDAR (Light Detection and Ranging, or Laser Imaging, Detection, and Ranging) survey had been conducted to determine the budget and timetable for completing the mass grading process, and the cost and scheduling projections related to mass grading that were shared with DOE and the MPSC were based on the LIDAR survey.

90.     Defendants discovered in 2010, however, that the LIDAR survey had not been done properly, and, as a result, millions more cubic yards of dirt had to be moved to complete mass grading. Accordingly, the mass grading process would be much more expensive and time-

23

consuming than what was conveyed in the estimates Defendants provided to the DOE and MPSC, eating into the contingency funds that were set aside.

91.     Nevertheless, Defendants failed to correct their submissions and denied to the government that there would be any cost impact to the project.

92.     Then, in 2011—with construction underway, costs ballooning, and DOE money pouring in—Defendants undertook a series of internal cost re-estimates that they did not share with regulators or other outsiders because the results exceeded the Certified Cost Estimate.

93.     A May 2011 internal estimate found that Kemper would exceed the Certified Cost Estimate by 18%. Hoping that, somehow, a more favorable number could be procured, management asked the Project Controls Department to perform its own estimate.

94.     To that end, in June 2011, Relator emailed Chris Curow, the Estimating Manager for that department, to ask when the re-estimate would be finished, and he replied that it would be ready the following Monday. Relator forwarded this correspondence to Project Director Steve Owen, who replied that he wanted to meet with Curow to see the Project Controls estimate "even if we have not scrubbed/reviewed it yet."

95.     At this meeting—which included Relator, Steve Owen, Randall Rush, Brett Wingard, Penny Manual, and Chris Coggin (a contractor)—Curow revealed that the Project Controls estimate for Kemper actually exceeded $3 billion, putting it more than 25% over the Certified Cost Estimate. Because this estimate was even more unacceptable to management than the May 2011 re-estimate, it was buried and not discussed again.

96.     Less than a year later, in April 2012, Defendants conducted another internal cost re-estimate (or "reforecast"), and this one predicted that Kemper would cost 38% above the

Certified Estimate, even when not accounting for the "effect of known delivery delays." Many of the drivers of this increased estimate had been known to Defendants for some time. For example, management had known for months that 50% more steel, 100% more pipe, and 400% more electrical cable would be needed to complete the "gasifier island." Likewise, the use of more materials meant more manpower would be needed as well, further increasing costs.

97.     To create the false impression for outsiders that the project would be delivered on budget, Thomas Anderson ordered impossible, arbitrary cuts in the estimate, knowing full well that these cuts would not result in actual savings and, in many cases, could not be implemented at all. Relator and her colleagues were told to cut tens of millions of dollars from their budgets despite the fact that the cuts could only be made on paper because they would either increase costs elsewhere (e.g., removing "small bore design" from the "Mechanical" budget meant it would need to be added somewhere else), would dramatically extend the schedule (e.g., eliminating the night shift), or would make complying with regulations or the terms of the Cooperative Agreement impossible.

98.     A document describing the effect of the cuts if they were actually carried out was attached to an email Steve Owen sent to the team on April 24, 2012. The document raised many concerns, including that an $8 million dollar cut to "Gas Tech" would mean that "Gas Tech would not be able to complete the deliverables and compliance activities required by the DOE Cooperative Agreement."

99.     Although it is normal to look for savings in a construction budget, it is fraudulent to make arbitrary cuts that to create the false appearance of remaining within a previous cost estimate. Highlighting the arbitrariness and lack of connection to actual project needs of his

25

demanded cuts, Anderson ordered Relator to cut an additional $27 million from an already stripped budget just a few hours before he was set to give a budget presentation at a production meeting. The reason was that he had been unable to cut those millions from elsewhere without raising red flags. Similarly, at another point, Relator explained to Anderson that she had calculated that an $8 million savings in wages could be achieved by no longer complying with the Davis Bacon Wage Act. Anderson ultimately decided that the resulting cut in wages would be a bad move, but he nonetheless demanded that Relator cut $8 million some other way—any other way that would not raise red flags—simply because he had already included this $8 million cut in his calculations.

100.    Relator had substantial experience with the standard budgeting process at Southern, which was designed to determine the true cost of a project. Costs were estimated from the ground up based on the materials and labor needed to complete the project. She recognized that budgeting for Kemper was irregular and improper, and she pushed back on Anderson's demands. In an email exchange following one of these attempts, Owen wrote to Relator: "I hear you are answering Tommy's [Thomas Anderson's] questions well; he just doesn't like the answers. Keep it going." She continued to push back, but to no avail.

101.    Despite the fact that Anderson's demanded cuts could not be implemented in reality, the cuts were made on paper, and the revised budget was presented to the independent monitors who had been hired by the MPSC. To disguise Defendants' budget manipulations, Steve Owen told his team in a May 8, 2012, email to remove any reference to the April reforecast in the spreadsheets to be presented to the independent monitors, writing "we will need the detailed spreadsheets without any reference to the April 2, 2012 base reforecast."

102.    Another way Defendants disguised the true cost and timeline of the Kemper Project was to push forward with construction even without needed materials, meaning that the work would have to be done over again in the future but the project would appear to be proceeding as planned for the time being. For example, while lacking the appropriate materials to secure piping, Defendants used temporary lashing to secure pipes, which meant the lashings would have to be replaced down the road at much greater cost both in manpower and materials. These additional costs would be incurred not just because the pipe work would have to be done twice but because doing pipe work after the rest of the structure is built—rather than along the way—is more difficult and labor intensive. Yet Defendants did not incorporate these future increased costs into Kemper's budget, nor did they inform DOE or the MPSC about them.

103.    Similarly, Defendants avoided costs in the short term by not paving roads. But they knew that the long-term impact of not paving was to add to the overall cost of Kemper because the gravel roads supporting heavy machinery needed to be regraded constantly. They left the cost to complete the roads out of their estimates to disguise that costs were increasing.

### Budget Problems Acknowledged, But Only Partially

104.    Later in May 2012, after the MPSC had re-approved the MPSC Certificate, Defendants announced a $376 million overrun, which still kept the official estimate under the cost cap set by the MPSC. This admission was itself a deception, as internal estimates already showed that the cost of Kemper would exceed the cost cap.

105.    An August 2012 email from Mississippi Power CEO Ed Day to other high-level officials confirms that management was committed to keeping these budget problems from becoming known outside Southern Company/Mississippi Power:

> **I would like to remind everyone "again", no numbers,
> schedules, or information in general should be communicated
> to external parties until I review it/them first………no
> speculation, no estimates, no forecast, etc.**
>
> Tommy Anderson will continue to be our project lead. Run everything by
> Tommy and he will discuss with me.

(Emphasis in original). Of course, as the 2010 email from Mr. Day described above shows, he

had known since 2010 that the budget estimate for Kemper was unrealistic.

106.    Nine months later, in May 2013, Defendants announced an additional $540

million overrun. At the same time, they were forced to admit that they had not provided the

MPSC with requested cost information a year earlier, when the MPSC was in the process of

reevaluating Kemper's certificate. As a result, Ed Day stepped down, and Southern's top lawyer,

Ed Holland, took his place.

107.    Southern admitted in an SEC filing that Mississippi Power's internal controls had

been lacking. But this admission did not mark an end to Defendants' deceptions. Defendants did

not admit their intentional failure to employ internal controls nor reveal their cost estimate

machinations, and Holland publicly insisted falsely that there had been "no intentional

withholding of information."

### Defendants' Schedule Manipulations

108.    As with their official cost estimates, Defendants knew that the official schedule

for Kemper could not be achieved. In order to maintain the appearance of being on schedule,

Defendants used several tactics.

109.    For example, they repeatedly broke the "logic ties" in their scheduling software,

which controlled what work could be scheduled to be completed simultaneously and what could

only be done consecutively. They also discouraged employees from raising concerns about the schedule by bullying naysayers, such as engineer Brett Wingo.

110.    Additionally, some of Defendants' cost manipulations on paper (*e.g.*, eliminating the night shift) would have had profound scheduling impacts that were never acknowledged to outsiders.

111.    Eventually, the scheduling delays could no longer be hidden entirely. Kemper's failure to start operating as a clean coal plant in 2014 was not something that could be papered over. But, even then, Defendants continued to represent falsely that commercial operations were right around the corner, all the way up until the MPSC finally decided in 2017 to end the charade by pushing Mississippi Power to operate the plant exclusively as a natural gas plant and cease ostensibly working toward using gasified lignite.

<u>Availability Estimates</u>

112.    Kemper's purported commercial viability and cost-effectiveness were key to the project's support from both DOE and the MPSC. Moreover, the support of DOE was crucial to securing the MPSC's support and vice versa. Lack of funding from DOE would have doomed MPSC approval, and lack of approval from the MPSC would have doomed the entire project and caused Defendants not to be able to meet the Cooperative Agreement's requirement that they obtain all necessary permits.

113.    The economics of Kemper depended on many factors, but a key factor was the plant's expected "availability" rate. As defined by Mississippi Power, the availability rate was determined by dividing the number of hours the plant was expected to run by the number of

hours in a year. The Certified Availability Estimate was 59% in the first year of operation, 85% by the fifth year, and 89% by the eighth year.

114.    The Certified Availability Estimate was calculated with the assistance of a respected organization, the Electric Power Research Institute ("EPRI"). But the inputs Defendants supplied to EPRI were flawed in multiple ways. The early stage of design for the plant did require some speculation, but other inputs did not account for downtime that Defendants knew, even at that early design stage, would be unavoidable. Repair times, for example, did not account for the time needed for plant cooldown or for returning the plant to service after a repair.

115.    A new availability estimate was conducted as early as 2012, and no later than 2014, when Defendants engaged World Oil Services ("World Oil") to make an assessment. World Oil estimated that Kemper would achieve a rate of only 35% in the first year, 75% in the fifth year, and never greater than 85%. World Oil also identified major flaws in the earlier analysis, citing "an extreme example" in which a repair that the original availability estimate assumed would take four hours would actually take four weeks.

116.    In stark contrast to what they knew internally, CEO Ed Holland told a local news station in an August 2014 interview that Kemper "will run 100 percent of the time."

117.    Defendants did not disclose the new availability estimate to DOE until they did so informally at a "production meeting" on April 20, 2016. The presentation materials for that meeting described the World Oil analysis as having been conducted in 2015 and estimating an availability rate of 30-35% for the first three to five years.

118. In October 2016, however, Bruce Harrington, the Plant Manager for Kemper, testified to the MPSC that the new availability estimate was conducted in 2014, not 2015. He conceded that the maximum projected availability was reduced from 89% to 85%, but he sought to downplay the significance of that difference, calling it "similar" (though acknowledging the escalation rate in the new estimate was slower). "Direct Testimony of Bruce C. Harrington," DOCKET NO. 2016-AD-0161, at 9.

119. The MPSC did not take Harrington's view of the impact of the reduction in the estimated availability rate. In its order of July 2017, the MPSC observed, in concluding that Kemper should run as a natural gas plant only, that:

> The Company's current forecast of plant availability is well below what was anticipated at the time of certification, and the heat rate is below certification estimates as well. This is inconsistent with the Commission's expectations for the performance of the gasification portion of the Kemper Project.

"Order Opening Docket," Docket no. 2017-AD-112, at 30. The order further noted that the MPSC "was clear in the [2012] Order on Remand that '[t]he economics of the [Kemper] Project are dependent upon the accuracy of the Company's cost and performance estimates.'" *Id.*

120. When Relator privately asked Harrington how the original availability estimate had been reached, he told her that the estimate was based on what it needed to be for the plant to be viewed by the MPSC as the best economic choice.

**False Statements to DOE to Secure and Retain the Allocated $245 Million**

121. As detailed above, Defendants knew before, during, and after the Initial Disbursement Period that Kemper's projected cost, the time needed for completion, and the performance estimates were far less favorable than the official estimates. But they did not

apprise DOE of anticipated cost overruns "immediately," as required by Section 2.5(d) of the Cooperative Agreement—or at all. Nor did they submit Special Status Reports to DOE as required by Cooperative Agreement Attachment B to report cost overruns, amended cost projections, or scheduling delays.

122.    As specified in Section 2.23 of the Cooperative Agreement, both of these reporting failures constituted material noncompliance with the terms of the Agreement. In order to obtain future disbursements and disguise their decision not to submit required reports, Defendants affirmatively made knowingly false representations to DOE that the Certified Cost Estimate remained accurate and that the project was on track to be completed on schedule.

123.    Specifically, in a series of quarterly progress reports beginning with the third quarter of 2010 and ending with the first quarter of 2012, Defendants repeatedly represented: "Project is on schedule and on budget."

124.    In reality, Defendants had known since before breaking ground in 2010 that the Certified Cost Estimate—which they purported to be "confident" in—was unrealistic and had been created using an irregular budgeting process.

125.    Additionally, their internal re-estimates, beginning no later than the first half of 2011, confirmed that the Certified Cost Estimate was unachievable. And some of their methods to hide cost overruns on paper, such as eliminating the night shift, would have had significant implications for the schedule that were also hidden from DOE.

126.    Defendants' false representations about Kemper's cost and schedule were reiterated to DOE during regular production meetings, which were attended by DOE representatives. The production meetings included an ostensible cost review comprised of a labor

32

report, major equipment report, engineer procured budget and forecast changes, potential budget overruns, an engineered commodities and craft labor production report, the budget cost estimate to date, and budget to actual comparisons, all of which were falsified to conceal the fact that the project would well exceed the $2.4 billion Defendants represented. As described above, the cost and schedule projections Defendants were creating for dissemination outside the company were manipulated, and those manipulations were covered up.

127.    Defendants' systematic concealment of its cost projections for Kemper is also reflected in Defendant Southern Company's SEC filings. For example, in its annual Form 10-K for 2011, filed at the end of February 2012, Southern falsely maintained that the "estimated cost of the plant is $2.4 billion." By contrast, Defendants were internally predicting costs of over $3 billion at that time, as detailed above. Similarly, the company's 2012 Form 10-K, filed at the end of February 2013, estimated Kemper's cost at $2.88 billion, still well below what Defendants had estimated no later than 2011.

128.    Another way Defendants materially deceived DOE was by asserting in each of their quarterly reports that they had obtained the MPSC Certificate for Kemper. While technically true, those assertions about the Certificate were implicitly false because Defendants did not inform DOE that the Certificate was being retained by providing false information to the MPSC about the status and economics of the Kemper Project.

129.    While Defendants were knowingly making false representations to DOE, DOE was paying out the $245 million allocated for Kemper's construction in installments. By April 2011, roughly $60 million had been paid out, and, by June 2011, roughly $111 million had been

paid out, leaving roughly $134 to be paid after June 2011. By the end of 2011, DOE had

provided the entire $245 million to Defendants.

130.    To obtain these funds from DOE, Defendants had to submit "request for

reimbursement" forms (Standard Form 270). In each request for reimbursement, Defendants

made the additional false certification that "all outlays were made in accordance with grant

conditions." This certification was false because the Cooperative Agreement's grant conditions

included the reporting requirements with which Defendants had knowingly failed to comply.

Additionally, Defendants had made outlays on Kemper that were intended to conceal problems

for as long as possible rather than to comply with the grant requirement that Defendants work

toward the completion of a clean coal plant.

131.    Specifically, Attachment A to the Cooperative Agreement, "Statement of Project

Objectives," from 38-39 states unequivocally that the project's goals are to demonstrate the

commercial viability of the new TRIG™ technology, as well as various carbon-capture

technologies—that is, the project's purpose was to demonstrate the viability of clean coal.

132.    After receiving the $245 million in CCPI2 funds, Defendants continued their

misrepresentations about their cost and schedule projections for Kemper. Their public

misrepresentations were also communicated to DOE and the MPSC. Examples include:

- On April 25, 2012, Defendant Southern Company held a conference call for

  analysts, media representatives, and investors during which the company

  forecasted a summer 2013 startup date for the Kemper Plant, stating:

  > Initial startup and testing are now only 14 months
  > away. And we remain confident that this project will
  > provide the best value to customers over the long
  > term. Targets remain achievable for [the] Kemper

County project[] with regard to construction schedule and cost to customers.

- In July 2012, Thomas Anderson testified to the MPSC that he remained "confident we can build it under the cap [of $2.88 billion]."

- In August 2012, Mississippi Power issued a press release announcing that the Kemper Plant would be commercially operational by May 2014.

- In September 2012, Mississippi Power issued a press release announcing that the Kemper Project was approximately 50% complete and should begin powering Mississippi homes and businesses in May 2014.

- In October 2012, Mississippi Power announced that the Kemper Plant was on schedule for a May 2014 completion date and was 70% complete, and that new effluent pipes and transmission equipment were completed ahead of schedule.

133.    To justify these and other false projections, Defendant Southern, through Thomas Anderson, instructed Relator and others to cut their budgets to levels that were not achievable but would not raise alarms to those outside the company, as detailed above. Relator was required to estimate construction costs in many categories at lower levels than Southern had ever achieved on any past project. Relator was also instructed to exclude previous predictions from her estimates to conceal that unexplained cuts had been made to her budget. Other mandated cuts, like the Gas Tech cuts, would have made complying with the Cooperative Agreement impossible if the cuts were actually implemented.

134.    Defendants' deceptions after the Initial Disbursement Period concealed their past false statements and their ongoing material noncompliance with the Cooperative Agreement, thereby causing the government to continue to pay Defendants.

135.    Because Defendant Southern's noncompliance with reporting requirements was material under the Cooperative Agreement, Southern's false statements to conceal this noncompliance were material to DOE's decision to pay and continue paying government funds to Southern for the Kemper Project. Consequently, Southern's requests for payment through the federal government's Automated Standard Application for Payments System and its invoices constituted false and fraudulent claims to the government.

136.    Had DOE been aware that Defendants were not complying with the Cooperative Agreement's reporting requirements and were instead intentionally misrepresenting the status and outlook for the Kemper Project, DOE would not have paid Defendants.

137.    If DOE had known that the official estimates about Kemper's costs and schedule were believed internally to be unrealistic before ground was broken, DOE would not have pushed the MPSC to approve the project and would not have funded the project.

138.    Consequently, for the reasons described above, Defendants knowingly presented, or caused to be presented, to an officer or employee of the United States, false or fraudulent claims for payment or approval, i.e., the claims for the DOE funding described above, and/or Defendants knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim for payment or approval by the United States Government and/or to conceal an obligation to pay money to DOE.

**Defendants' Additional False Statements to the MPSC**

139.    As with respect to DOE, Defendants were required to provide the MPSC accurate

information about the Kemper Project. The MPSC also required Defendants to continually

reassess the economics of the Kemper Project to ensure that it remained the best option for

ratepayers and that the MPSC Certificate should not be rescinded:

> The cost overruns, delays, and operational challenges of the
> Kemper IGCC gasification assets concerns that the Commission
> has consistently discussed in its orders are also at odds with any
> reasonable expectations of [Mississippi Power Company]. Indeed,
> [Mississippi Power Company] has been under an obligation to
> continually evaluate the Kemper Project for just such issues since
> it received its certificate.

"Order Opening Docket," Docket no. 2017-AD-112, at 31.

140.    To facilitate obtaining accurate information, the Commission itself and the

Commission's staff each employed an independent monitor for Kemper. But the independent

monitors were still dependent on receiving accurate information from Defendants. And

Defendants continually made misrepresentations of what they actually knew about the projected

cost of the project.

141.    Defendants claimed confidence in their cost projections in their communications

with the MPSC. To support its assertions that the construction cost would not exceed $2.4

billion, Mississippi Power presented witnesses that stated they were "confident" in the

company's ability to complete the construction consistent with those estimates, which they

described as "conservative."

142.    Defendants' confidence in their cost estimates is a substantial part of what drove

the MPSC to grant the certificate: "Indeed, as discussed below, it is [Mississippi Power

Company]'s repeated statements of confidence that provide substantial evidence to support the Commission's conditions." *Id.* at 32.

143.    However, at the time Defendants' experts were making these assertions of confidence before the MPSC, Defendants knew the cost estimates were not accurate or reliable. CEO Ed Day, as described above, wrote to senior member of his team on May 4, 2010, that he did not see how Kemper could be completed for $2.4 billion. He pointed out that a planned Duke Energy plant *that did not include carbon-capture technology* had a projected cost of $2.9 billion.

144.    Having obtained and retained the MPSC Certificate for Kemper through false representations, Defendants in turn represented to DOE in quarterly progress reports that this permit was in place. Because acquisition and maintenance of this Certificate was a material condition of the Cooperative Agreement, and because Defendants acquired and maintained that permit through false and fraudulent statements made to the MPSC, Defendants knowingly made implicit false statements to DOE in those quarterly reports when they stated that they had received the MPSC Certificate.

### DOE's 2016 Funding of Kemper and Defendants' Ongoing Fraud

145.    In Section 313 of the Congress's 2016 Consolidated Appropriations Act, Congress mandated that DOE reallocate $160 million in funds from energy projects that did not get off the ground to still-viable clean coal projects. (The legislation refers to projects that had achieved "financial close," an underlying assumption of which was that the project must have still had a chance of succeeding.)

146.    DOE identified two such projects: Kemper and Petra Nova (a clean coal project underway in Houston, Texas). DOE announced that it would provide $137 million to Kemper

and $23 million to Petra Nova, while providing Petra Nova with an additional $167 million from other sources.

147.    The Cooperative Agreement was amended on March 15, 2016, to obligate the additional DOE funding to Kemper. The amendment, Modification 12, stated that Kemper expected "no change to the total overall estimated cost of the Project which remains at $2,065,013,164," the level set in Modification 007 in September 2010. The amendment did not relieve Southern of its reporting obligations under the Agreement.

148.    In conjunction with announcing the new funding, DOE cited Defendants' representation to the agency that Kemper was expected to be fully operational by the end of 2016 as a commercial clean coal plant. In reality, new setbacks, including the fact that the gasifier's refractory material was falling apart, meant Defendants did not anticipate becoming fully operational by the end of 2016.

149.    Defendants also continued to falsely represent to DOE that Kemper was economically viable and that the MPSC Certificate was in place—without revealing that the Certificate was obtained and retained by deceiving the MPSC.

150.    Under these false pretenses, Defendants submitted their request for the $137 million grant on April 7, 2016, and received the funds soon thereafter ("2016 Disbursement"). The request for reimbursement form stated that the funds were for expenses incurred between January 1, 2009 and December 31, 2014.

151.    Like in all the requests for reimbursement that preceded it, Defendants certified in this one that "all outlays were made in accordance with grant conditions." Defendants did not reveal to DOE that they had intentionally not complied with the Cooperative Agreement's

reporting requirements and had instead submitted false reports. They also did not reveal that they had made expenditures to disguise the true state of the project, rather than to advance it, such as by hanging pipe with temporary fasteners that would have to be replaced disruptively and at greater cost later.

152.   Only after securing the 2016 DOE funding did Defendants admit that their certified "availability" estimates—meaning the number of hours per year Kemper could run and thus the amount of energy the plant could produce—were wrong. But Defendants had known the certified availability estimate was wrong for years, as described above.

153.   Defendants' false representations that Kemper would soon be operational and the intentional concealment of the availability estimate in turn concealed from DOE that the MPSC was likely to rescind its approval of Kemper, ending the project.

154.   In other words, Defendants knew that Kemper was no longer viable. The plant was not on track to be operational in 2016 and Defendants were aware that their official projections for the Kemper Plant's "availability" once operational were based on false inputs and were unachievable.

155.   Defendants' ongoing deceptions and failure to admit their past systematic concealments permitted Defendants to remain eligible for this additional DOE funding. If DOE had known that Defendants intentionally failed to meet their reporting requirements and/or had known that they were submitting knowingly false and fraudulent reports, Defendants would have been deemed ineligible for future allocations, including the $137 million allocated in 2016. Had DOE learned that Defendants were knowingly engaging in a deceitful and fraudulent course of conduct vis-à-vis DOE, state regulators, the SEC, and the public, DOE would have deemed

Defendants to lack the integrity and level of responsibility warranting DOE's continuing contribution of hundreds of millions of dollars of taxpayers' funds to their project.

156.   Additionally, if DOE had known in 2016 that the Kemper Project was not economically viable, the agency would have recognized that the project would lose MPSC support and, thus, the agency would not have allocated the additional $137 million to the project. Those funds would instead have been allocated to Petra Nova, which began operating as scheduled in January 2017.

157.   Defendants' false representations about the viability of Kemper resulted in DOE providing this additional $137 million in funding and, therefore, constitute false claims and/or Defendants, by submitting those false representations, knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim for payment or approval by the United States Government.

### Count I – False Claims Act, 31 U.S.C. §§ 3729(a)(1)(A) and (a)(1)(B)

158.   Relator incorporates each paragraph of this Complaint as if fully set forth herein.

159.   In the course of obtaining the permits and certificates necessary for the Kemper Project, Defendants made statements they knew to be false to DOE, the MPSC, and others.

160.   For example, on May 4, 2010, as Defendants were assuring DOE and the MPSC that they were "confident" in their cost and schedule estimates for Kemper, CEO Ed Day was expressing doubts to his team that the project could be completed for certified estimate.

161.   As the project progressed, Defendants continued to make material false statements to obtain DOE funds. For example:

a)  Defendants averred to DOE in numerous quarterly reports from 2010 to 2012 that the project was "on schedule and on budget" when in reality it was neither. These falsehoods concealed both the true status of the Kemper Project as well as Defendants' failure to comply with the special reporting requirements imposed by the Cooperative Agreement. These falsehoods and failures to comply with the reporting requirements of the Cooperative Agreement denied DOE the accurate data that was one benefit of the agency's bargain with Defendants.

b)  Defendants averred in all quarterly reports to DOE that the crucial MPSC Certificate was in place, but they did not reveal to DOE the material fact that they had deceived, and were deceiving, the MPSC about the cost, status, and commercial viability of Kemper—including the plant's availability estimate—in order to obtain and retain this permit. Defendants' intentional failure to disclose how they obtained and retained the MPSC Certificate enabled them to receive the Initial DOE Disbursement as well as the 2016 Disbursement.

c)  Defendants certified in each request for reimbursement submitted to DOE that they had made all outlays in accordance with grant conditions when, in reality, they were intentionally not meeting their reporting obligations, which were grant conditions. Additionally, Defendants were making outlays that were intended to conceal cost and schedule problems in the short term but would make the project more expensive in the long term, such as by improperly hanging pipe. Such outlays were not made in accordance with the Cooperative Agreement's condition that Defendants work toward

the goal of successfully demonstrating TRIG™ technology with carbon capture on a commercial scale.

162.   The above-described actions show that Defendants knowingly presented, or caused to be presented, to an officer or employee of the United States, false or fraudulent claims for payment or approval, in violation of 31 U.S.C. § 3729(a)(1)(A).

163.   Defendants also knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim to the United States Government, in violation of 31 U.S.C. § 3729(a)(1)(B).

164.   As a result of these claims, the United States Government paid Defendants and suffered damages to be determined at trial.

## Count II – False Claims Act, 31 U.S.C. § 3730(h)

165.   Relator incorporates each paragraph of this Complaint as if fully set forth herein.

166.   Relator was retaliated against for reporting to her superiors at the Defendant companies, including her employer, Southern Company, her objections about the false information Defendants were supplying to the public and to governmental entities, including DOE and the MPSC. As a result, Relator was excluded from management meetings and eventually demoted.

167.   Relator had been on a list of rising stars at Southern, but after she began raising concerns about Kemper, she was removed from the list and was characterized as not being a "team player."

168.   Additionally, Relator had been given an "exceeds expectation" rating by her manager in a year-end performance review, but before the reviews were finalized, Relator's

manager was directed by a superior to change the review to a lower rating. The manager

provided Relator with no explanation for this retaliatory action other than that it was related to

the Kemper Project.

169.    Through this conduct, Defendants violated 31 U.S.C. § 3730(h), and Relator is

entitled to all appropriate relief as provided in § 3730(h)(2).

## Jury Trial Demanded

The United States of America, on the relation of Kelli Williams, hereby demands trial by

jury on all issues so triable.

WHEREFORE, Relator Kelli Williams respectfully requests that the Court enter

judgment in her favor and in favor of the United States of America, awarding treble damages,

penalties, and all appropriate relief for violations of the False Claims Act, and awarding Relator

Kelli Williams thirty percent of the government's recovery as well as costs and attorney fees.

Respectfully submitted,

/s/ Julia Rickert

Mike Kanovitz
Dan Twetten
Julia Rickert
Frank Newell
Loevy & Loevy
311 N. Aberdeen Street, 3rd Floor
Chicago, IL 60607
Ph: (312) 243-5900

Jack Kolar
Karen Gray
Government Accountability Project
1612 K Street, N.W.
Suite 1100

Washington, DC 20006
Ph: (202) 457-0034

*Attorneys for Relator*

Dated: October 30, 2023