## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA

UNITED STATES OF AMERICA *ex rel.,*

KELLI WILLIAMS,

                 Plaintiff-Relator

        v.

THE SOUTHERN COMPANY, INC.;
SOUTHERN COMPANY SERVICES,
INC.; and MISSISSIPPI POWER
COMPANY;

             Defendants.

Civil Action No.
1:18-CV-0680-SCJ

## DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 9(b), 12(b)(1), AND 12(b)(6)

Defendants The Southern Company, Inc., Southern Company Services, Inc., and Mississippi Power Company (collectively "Defendants") respectfully request that the Court dismiss Plaintiff-Relator Kelli Williams's ("Relator") Amended Complaint with prejudice pursuant to Federal Rules of Civil Procedure 9(b), 12(b)(1), and 12(b)(6).

## **TABLE OF CONTENTS**

I.    PRELIMINARY STATEMENT & FACTUAL BACKGROUND ..............1

II.    PROCEDURAL BACKGROUND .................................................4

III.   STANDARD OF REVIEW ..........................................................5

IV.   ARGUMENT..............................................................................5

    A.    The FCA's Public Disclosure Bar ......................................5

        1.    The Public Disclosure Bar Deprives the Court of Jurisdiction Under Federal Rule of Civil Procedure 12(b)(1). ....................................................................6

        2.    Relator's Amended Complaint Is Barred by the Public Disclosure Bar and Should Be Dismissed with Prejudice Under Federal Rule of Civil Procedure 12(b)(6). .....................7

            (a)   *Relator's Allegations Have Been Publicly Disclosed.*.........................................................7

            (b)   *Relator's Allegations Are Substantially the Same as Prior Public Disclosures.*............................7

            (c)   *Relator Is Not an Original Source.*................................16

    B.    Relator's Allegations of Fraud Are Not Sufficiently Particular Under Federal Rule of Civil Procedure 9(b). ....................................17

        1.    Schedule Delays ........................................................19

        2.    Cost Overruns .........................................................20

        3.    Availability Estimates ...............................................22

V.    CONCLUSION.........................................................................25

# TABLE OF AUTHORITIES

CASES

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)................................................................5

*Cooper v. Blue Cross & Blue Shield Fla., Inc.*,
  19 F.3d 562 (11th Cir. 1994) ..................................................6

*Dingle v. Bioport Corp.*,
  388 F.3d 209 (6th Cir. 2004) ..................................................8

*Fed. Deposit Ins. Corp. v. Fifth Third Bank, N.A.*,
  651 F. Supp. 3d 722 (S.D.N.Y. 2023) ..................................17

*Hopper v. Solvay Pharms., Inc.*,
  588 F.3d 1318 (11th Cir. 2009) ..............................................5

*United States ex rel. Brown v. Walt Disney World Co.*,
  No. 606-CV1943-ORL-22KRS, 2008 WL 2561975 (M.D. Fla. Jun.
  24, 2008) ................................................................................6

*U.S. ex rel. Clausen v. Lab'y Corp. of Am.*, 290 F.3d 1301, 1310 (11th
  Cir. 2002). ............................................................................24

*United States ex rel. Osheroff v. Humana Inc.*,
  776 F.3d 805 (11th Cir. 2015) ......................................passim

*United States ex rel. Schubert v. All Children's Health Sys., Inc.*,
  941 F. Supp. 2d 1332 (M.D. Fla. 2013)................................16

*United States ex rel. Kromenaker v. Kimberly-Clark Corp.*,
  No. 1:15-CV-04413-SCJ, 2019 WL 2564570 (N.D. Ga. Mar. 27,
  2019) ......................................................................................8

*United States ex rel. Lamers v. City of Green Bay*,
  168 F.3d 1013 (7th Cir. 1999) ..............................................18

*United States ex rel. Morton v. A Plus Benefits, Inc.*,
    139 F. App'x. 980 (10th Cir. 2005) ...................................................18

*United States ex rel. Saldivar v. Fresenius Med. Care Holdings, Inc.*,
    841 F.3d 927 (11th Cir. 2016) ........................................................7

*United States ex rel. Schutte v. SuperValu Inc.*,
    598 U.S. 739 (2023) .....................................................................18

*United States v. AseraCare, Inc.*,
    938 F.3d 1278 (11th Cir. 2019) ......................................................18

*United States v. Odom*,
    No. 3:20CV3678-MCR-ZCB, 2023 WL 5203000 (N.D. Fla. Jun.
    22, 2023) ...............................................................................16, 17

*Universal Health Servs., Inc. v. United States ex rel. Escobar*,
    579 U.S. 176 (2016) ................................................................18, 19

## STATUTES

31 U.S.C.
    § 3729(a)(1) ......................................................................4, 5, 18
    § 3729(b)(1) .............................................................................18
    § 3729(b)(4) .............................................................................18
    § 3730(e)(4) .......................................................................passim
    § 3730(h) ...................................................................................4

## OTHER AUTHORITIES

48 C.F.R. 35.002 ..........................................................................3, 19

Federal Rule of Civil Procedure 9(b) ..........................................passim

Federal Rule of Civil Procedure 12(b)(1) .......................................5, 6

Federal Rule of Civil Procedure 12(b)(6) ...............................2, 4, 5, 7

## I.    PRELIMINARY STATEMENT & FACTUAL BACKGROUND

Relator is a former Southern Company Services, Inc., employee who purports to expose a multi-year fraud arising from Defendants' relationship with the U.S. Department of Energy ("DOE").  Relator's well-trodden allegations, however, are many years too late and come before this Court long after they were publicly disclosed by Defendants and others.  Her allegations arise from Defendants' partnership with the DOE, through which Defendants undertook a research and development ("R&D") effort to develop a first-of-its-kind coal-based technology in Kemper County, Mississippi ("the Kemper Project" or "the Project").  During the course of this R&D effort, the Project faced significant setbacks, including cost overruns and schedule delays, and experienced financial, political, and regulatory consequences for the same.  To be sure, with her Amended Complaint, Relator merely seeks to opportunistically gain from Defendants' misfortunes by recasting these well-publicized setbacks into a far-reaching scheme to defraud the DOE and the Mississippi Public Service Commission ("MPSC").

Her efforts fail for two reasons.  ***First,*** each of her factual allegations have already been publicly disclosed and widely disseminated.  Relator's claims are therefore barred by the False Claims Act's ("FCA") public disclosure bar.  And Relator, due to her substantial delay in bringing this action and failure to add any material information to the prior public disclosures, is not an "original source" of the

information in the Amended Complaint.  **Second,** Relator's Amended Complaint falls well short of the Rule 9(b) heightened pleading standards.

By way of background, in 2004, the DOE selected The Southern Company's ("Southern") proposal to develop a facility that would convert coal into clean, usable energy using Transport Integrated Gasification ("TRIG") technology.  The DOE and Southern formalized their partnership in this R&D effort through a Cooperative Agreement ("CA")[1,2] pursuant to which the DOE disbursed $245 million in installments between the end of 2010 and the end of 2011 and $137 million in 2016.  *See* Am. Compl. ¶¶ 76, 150.  The CA tasked Southern with attempting to design, construct, and operate the Kemper Project.   Southern shouldered a substantial majority of the cost and risk, with the DOE sharing a fractional 14.2% of the total Project cost **with no responsibility for any cost overruns.**  *See* Ex. 1, Attach. A at 9–10; *id.* § 2.5(I)–(II).  Defendants' initial projected completion date of the Kemper Project was October 2014, and the initial projected total cost was over $2 billion.

---

[1] The parties renegotiated the CA, with Modification 10 in 2014, restating the entire agreement after the Project's relocation from Orlando, Florida, to Kemper County, Mississippi.  *See* Ex. 1 (Modification 10).  The CA was ultimately modified 20 times.  *See* Ex. 2 (Modifications 11–20).

[2] Defendants have filed exhibits in support of their Motion to Dismiss, along with an Appendix for ease of reference.  In addition to the pleadings, "a district court may consider" judicially noticed documents and "extrinsic document[s] even on Rule 12(b)(6) review if [they are] (1) central to the plaintiff's claim, and (2) [their] authenticity is not challenged."  *United States ex rel. Osheroff v. Humana Inc.*, 776 F.3d 805, 811 (11th Cir. 2015).

*See id.* The CA set forth an aspirational "performance target" for the Project's "availability" (*i.e.*, the amount of time the plant could produce electricity in a given year). The parties' agreed-upon goal was for Kemper to achieve an availability target of 80% during the Project's fifth year.[3] *Id.*, Attach. A at 8. Before breaking ground on the Project, the MPSC issued Defendants a Certificate of Public Convenience and Necessity ("MPSC Certificate"). The MPSC's independent monitors ("IM"), along with DOE representatives, were a constant presence, thoroughly involved in every stage of the Project's development, "[g]iven the unprecedented scope and cost[.]" Ex. 33 ¶ 213.

The Project experienced significant setbacks—all of which were known to the DOE, the MPSC, and the public by virtue of extensive reporting in news media, state regulatory filings (and their representative IMs), and, as early as 2013, Southern's own disclosures filed with the Securities and Exchange Commission ("SEC"). Among the dozens of outlets that reported on the Project, The New York Times published an article in 2016 (accompanied by nearly 200 documents) detailing an earlier whistleblower's accusations of "mismanagement" and "fraud," upon which Relator plainly piggybacks. *See* Ex. 29, 30. Prior to this action, Southern also disclosed in 2016 and 2017 several lawsuits and an SEC investigation, all of which

---

[3] *See* 48 C.F.R. 35.002 (explaining that "[t]he primary purpose of contracted R&D programs is to advance scientific and technical knowledge" and that "[i]t is difficult to judge the probabilities of success or required effort for" such projects).

focused heavily on the cost overruns, schedule delays, and other alleged operational failures experienced at Kemper.  *See* Exs. 10 at 28–29; 12 at II-40; 13 at 40–41.

Notwithstanding the widespread public knowledge of the Project's setbacks, ***the DOE continued to publicly and financially support it throughout***, "st[anding] by [the Project] during its delays and budget overruns." Ex. 59 at 9.  Indeed, the DOE continued to disburse funds to Defendants and even entered into several modifications to the CA after Mississippi Power suspended gasifier operations.  *See generally* Ex. 2.  DOE also has publicly touted the success of the Project and its partnership with Defendants, referring to Southern as an "ambitious and forward-leaning partner." Ex. 59 at 9.  In DOE's own words, the "lessons learned. . . [have been] extensive," and the Project "[has] provided valuable information that will apply to future [integrated gasification combined cycle] and other coal-based endeavors." Ex. 5 at 3.  Ultimately, Southern and the DOE accomplished the goal of their R&D partnership—successful demonstration of the TRIG technology.  *Id.*

## II.    PROCEDURAL BACKGROUND

Relator initiated this action on February 14, 2018.  [D.E. 1]  After more than five years, the Department of Justice ("DOJ") declined to intervene in July 2023. [D.E. 8]  On October 30, 2023, Relator filed an Amended Complaint, which asserts two causes of action under sections 3729 and 3730 of the FCA, respectively.  31 U.S.C. §§ 3729(a)(1)(A), (B), 3730(h); Am. Compl. ¶¶ 158–69.

## III.   STANDARD OF REVIEW

The Amended Complaint must be dismissed under Rule 12(b)(6) if the facts as pleaded do not state a plausible claim for relief.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake," and the Eleventh Circuit applies this heightened pleading standard to FCA claims.  Fed. R. Civ. P. 9(b); *see Hopper v. Solvay Pharms., Inc*., 588 F.3d 1318, 1324 (11th Cir. 2009).

## IV.   ARGUMENT

Defendants move to dismiss Relator's Amended Complaint under Rules 12(b)(1), 12(b)(6), and 9(b).  ***First,*** Relator's claims are barred by the FCA's public disclosure bar.  ***Second,*** Relator has failed to meet her pleading obligations under Rule 9(b).

### A.   The FCA's Public Disclosure Bar

The FCA imposes civil liability on "any person" who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim" to the federal government.  31 U.S.C. §§ 3729(a)(1)(A)–(B).   The FCA's "public disclosure bar," however, prohibits private *qui tam* actions based on information publicly disclosed prior to the initiation of a relator's action.  *See* § 3730(e)(4)(A).   The public disclosure bar aims to "prevent[] opportunistic suits by private persons who heard of fraud but played no

part in exposing it." *Cooper v. Blue Cross & Blue Shield Fla., Inc.*, 19 F.3d 562, 565 (11th Cir. 1994). Indeed, the FCA requires dismissal when (1) the allegations or transactions have already been publicly disclosed; (2) the disclosed information was substantially the same as the allegations in the relator's suit; and (3) relator is not an "original source" of that information. 31 U.S.C. § 3730(e)(4); *Osheroff*, 776 F.3d at 812. Here, the public disclosure bar operates to bar Relator's claims under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

### 1.    The Public Disclosure Bar Deprives the Court of Jurisdiction Under Federal Rule of Civil Procedure 12(b)(1).

Prior to congressional amendment on March 23, 2010, the FCA's public disclosure bar was jurisdictional; it was not an independent "ground[] for dismissal for failure to state a claim[.]" *Osheroff*, 776 F.3d at 809–10. Congress did not make the amendment retroactively applicable, and thus, the Eleventh Circuit has applied the pre-2010 FCA to conduct alleged to have occurred *before* March 23, 2010, and the amended FCA to conduct alleged to have occurred *after* March 23, 2010. *Id.* at 809–11. As discussed at length below, Relator's Amended Complaint is recycled from years of prior public disclosures, including alleged misconduct arising *before* March 2010. Thus, her claims are jurisdictionally barred in their entirety and should be dismissed pursuant to Rule 12(b)(1). *See, e.g.*, Am. Compl. ¶¶ 7, 21, 24, 28, 42, 50–51, 82, 144, 159; *United States ex rel. Brown v. Walt Disney World Co.*, No. 606-CV1943-ORL-22KRS, 2008 WL 2561975, at *5 (M.D. Fla. Jun. 24, 2008), *aff'd*,

361 F. App'x 66 (11th Cir. 2010) ("Eleventh Circuit decisional authority is quite clear that the jurisdictional bar applies if *any part* of an FCA claim is based on publicly disclosed information.").

> **2.     Relator's Amended Complaint Is Barred by the Public Disclosure Bar and Should Be Dismissed with Prejudice Under Federal Rule of Civil Procedure 12(b)(6).**

"Public disclosures" are, by statute, those made "in a (i) Federal criminal, civil, or administrative hearing in which the Government or its agent is a party; (ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or (iii) from the news media."   31 U.S.C. § 3730(e)(4)(A).

> (a)   *Relator's Allegations Have Been Publicly Disclosed.*

Relator's allegations have been disclosed in news media, SEC disclosures, congressional testimony, state regulatory filings, and other sources, as explained in detail below.  Those sources qualify as "public disclosures" under the FCA.  *Id.*; *see United States ex rel. Saldivar v. Fresenius Med. Care Holdings, Inc.*, 841 F.3d 927, 933 (11th Cir. 2016) (considering SEC filings to be "federal reports"); *Osheroff*, 776 F.3d at 813 (stating that "publicly available websites" that "are intended to disseminate information" fall within the "broad sweep" of "news media").

> (b)   *Relator's Allegations Are Substantially the Same as Prior Public Disclosures.*

Prior public disclosures that are "substantially the same" as the "allegations

or transactions as alleged" by a relator are barred as a matter of law. 31 U.S.C. § 3730(e)(4)(A).  In fact, the bar applies "even if the fraud is slightly different than the one alleged in the complaint," and even where a relator "includes some details that [were] not present in the public disclosures." *Dingle v. Bioport Corp.*, 388 F.3d 209, 214–15 (6th Cir. 2004); *Osheroff*, 776 F.3d at 814–15.  Moreover, the bar "requires only disclosures of allegations [or] *transactions*," meaning "allegations of wrongdoing are not required." *United States ex rel. Kromenaker v. Kimberly-Clark Corp.*, No. 1:15-CV-04413-SCJ, 2019 WL 2564570, at *4 (N.D. Ga. Mar. 27, 2019) ("[T]he public disclosure bar 'does not require each source to contain an allegation of wrongdoing.'") (quoting *Osheroff*, 776 F.3d at 814).  The Eleventh Circuit has described the "substantially the same" requirement as a "quick trigger to get to the more exacting original source inquiry." *Osheroff*, 776 F.3d at 814 (quotation omitted).

Relator alleges that Defendants obtained DOE funding by making false claims and statements related to (1) schedule delays, Am. Compl. ¶¶ 41–42, 109, 132; (2) cost overruns, *id.* ¶¶ 10, 21, 43, 53, 82–83, 86, 91–94, 97, 102–105, 126–127, 132; and (3) availability estimates, *id.* at ¶¶ 23–28, 114–20.  However, Relator's allegations are "substantially the same" as prior public disclosures from years before she filed her Complaint in 2018.[4]  In fact, by the time Relator filed her initial

---

[4] For ease of reference, Defendants have attached a demonstrative chart to this

Complaint, the same allegations were covered in dozens of news sources since 2012 (no fewer than 28 of which are attached to this Motion), at least seven different lawsuits in both state and federal court, and an SEC investigation.

*News Media Disclosures.*   The Amended Complaint repurposes the same allegations reported in dozens of news articles by local, state, and national media outlets, as well as in public MPSC filings.   Those publications extensively reported substantively similar allegations concerning Defendants' alleged fraud on the DOE and the MPSC.   For example, Relator alleges that "Defendants knowingly made false statements to DOE in quarterly reports that the project was 'on schedule' and 'on budget,' thereby concealing cost overruns and [schedule] delays," and that "[t]hese assurances, falsely made, were a requirement for Kemper to receive disbursements under the [CA]."   *Id.* ¶ 9.   She further alleges that Defendants "actively hid[] these problems from the DOE and MPSC" and "engage[d] in accounting cover-ups and false reporting[.]"   *Id.* ¶ 21.   However, in 2016 (almost *two years before* Relator filed her Complaint), The New York Times—in an exposé accompanied by a compendium of documents and secret recordings detailing allegations obtained from an earlier whistleblower—reported *virtually identical* allegations.   The Times

---

motion as Exhibit 3, providing a sample of quotations from and citations to the vast number of public disclosures that bar Relator's allegations in this action.  Certain exhibits did not contain original pagination so Defendants have accordingly numbered the pages of those exhibits.  *See* Exs. 5, 7, 14, 35, 45, 57, 61, 72, 73, 78.

reported that Defendants hid cost and schedule failures and published a "false schedule" "to qualify for hundreds of millions of dollars in federal subsidies" and to receive the MPSC Certificate.  Ex. 29 at 1, 6; Ex. 30.

Relator further alleges that "the cost and schedule projections . . . were manipulated" and "covered up," using several tactics, such as making "arbitrary [budget] cuts" and breaking "logic ties" (a method of manipulating sequencing in scheduling software) to conceal construction delays.  Am. Compl. ¶¶ 97, 109, 126.  Again, those *same exact* allegations were made in The Times's 2016 article: "[The prior whistleblower's] predecessors had altered the [scheduling] software . . . "; and "documents and recordings . . . show that the plant's owners drastically understated the project's cost and timetable, and repeatedly tried to conceal problems as they emerged."  Ex. 29 at 1, 6.[5]

Not only does Relator repurpose these previously disclosed allegations, in some instances she uses exact phrasing used in The Times's reporting.  For example, she relies upon an email sent by former Mississippi Power CEO Ed Day to allege that Defendants sought to "keep . . . budget problems from becoming" public.  Am. Compl. ¶ 105.  The Times quoted *the same email* in its article.  Ex. 29 at 6.

---

[5] The Times was far from the only outlet covering these allegations.  *See, e.g.*, Ex. 62, 65, 70; *see generally* Ex. 3.  Southern vehemently disputed The Times's reporting, Ex. 67 at 2–3, and has allocated significant resources to defending against these repetitive and opportunistic claims.

Moreover, the Amended Complaint is replete with *verbatim* copying of The Times's descriptions accompanying the cache of documents published alongside its article. *See* Ex. 30.

Relator further alleges that the availability estimates presented to the MPSC in 2009, at the outset of Kemper's development, and later to the DOE, were "flawed in multiple ways," and that "as early as 2012, and no later than 2014," Defendants retained World Oil Services to conduct a new availability estimate that was much lower than, and "identified major flaws in," the original availability estimate.  Am. Compl. ¶¶ 114–15.  According to Relator, Defendants did not inform the DOE about the re-estimate until April 20, 2016, mere days after having received the second disbursement of federal funds.  *Id.* ¶¶ 117, 152.  However, the Project's availability was the subject of news media reporting and public MPSC filings prior to Relator's filing of the Complaint.

For instance, as early as January 2010, Thomas Anderson, the Mississippi Power Vice President of Generation Development, testified to MPSC that "[b]ecause TRIG [was] a newer technology, the Company recognize[d] that it [would] take some time to achieve operational excellence comparable to other Mississippi Power generating units."  Ex. 20 at 9.[6]  Additionally, a report issued by the Institute for

---

[6] In May 2014, Dr. Patricia Galloway of Pegasus Global Holdings, Inc., testified to MPSC specifically quoting Anderson's testimony, noting that there was "potential operational uncertainty of the Project," including availability.  Ex. 39 at 128.

Energy Economics & Financial Analysis in November 2012 challenged Defendants' public statements concerning construction progress, reporting that that "there [was] uncertainty as to whether" the slowed progress on the Project would "affect future . . . pre-operational testing and startup progress," and expressed concern about the Project's availability. Exs. 52; 53 at 5. Later, following remand from the Mississippi Supreme Court, in an April 2014 Order granting Mississippi Power the MPSC Certificate, the MPSC stated that "[t]he economics of the Project are dependent upon the accuracy of [Mississippi Power's] cost and performance estimates." Ex. 33 at 107. In the MPSC's words, "[p]ut simply, if [the] Kemper [Project] doesn't perform as advertised then the ratepayers will not pay for it." *Id.* at 108.

In an August 2014 Order, the MPSC observed that "[t]he Kemper Project continue[d] to face concerns and uncertainties related to ***cost, schedule[,] and operational availability***." Ex. 41 ¶ 1 (emphasis added). Indeed, Southern publicly acknowledged multiple times that the availability estimates were evolving. In May 2015, Samuel Sumner, the Project Asset Manager at Kemper, testified to the MPSC that the availably ramp-up would be slower than the original estimate. Ex. 21 at 9, SGS-3. Similarly, Southern's CEO stated during a 2016 earnings call that availability would be "a whole different number" than the original estimate for the first year of operation. Ex. 45 at 46.[7]   Still, consistent with the goals set forth in the

---

[7] The MPSC likewise knew that the estimates were evolving and that availability re-

CA, the DOE, in a September 2017 report published by its National Energy Technology Laboratory, ***publicly touted the Project's 38% availability rate*** and "31 days of continuous gasifier operations" as "consistent with typical first year gasification processes." Ex. 5 at 3.

*Federal Register & Congressional Record.*  An entry in the Federal Register and associated attachments, as well as testimony to the United States Senate, also disclosed substantially the same allegations and transactions as those in Relator's Amended Complaint.  In October 2015, a federal report of rulemaking by the Environmental Protection Agency discussed the Kemper Project and attached a June 2012 report by the MPSC IM.  Exs. 17; 18.  The IM report stated that Mississippi Power "expecte[d] their initial availability during the first year of operation to be 59%, which will ramp up to the mature availability of 89% after five years of operation." Ex. 18 at E-4.  The Report went on to caution that "it may be difficult to achieve the final 89% ***goal***[.]" *Id.* (emphasis added).  The IM report was also concerned that "[d]ue to the higher complexity of" the Kemper Project, "it [would] be difficult for [it] to achieve an availability rate equivalent to that of" Southern's

---

estimates were underway.  In April 2016, the IM issued a report stating that the re-estimate would be completed in "2 to 3 months." Ex. 24 at 18.  In July 2017, the MPSC issued an order explicitly highlighting that the "forecast of plant availability [was] well below what was anticipated at the time of certification[.]" Ex. 28 at 30. And in December 2017, testimony submitted on behalf of the Mississippi Public Utilities Staff to the MPSC expressed concern about the "reduced . . . projected expectation of plant availability" and the "slower [ramp-up] rate." Ex. 23 at 17.

existing coal plants.  *Id.* at E-9.  Additionally, testimony to the U.S. Senate Committee on Energy and Natural Resources in November 2013 by Christopher Smith, then-nominee for DOE Assistant Secretary for Fossil Energy, shows that the DOE was well aware of the significant cost overruns at the Kemper Project *five years* before Relator filed her Complaint: "We all know that they are way over cost, almost at $5 billion dollars . . . . So they're over double the cost."  Ex. 19 at 29.

*SEC Disclosures.*  Defendants' own SEC filings also disclosed "substantially the same" allegations or transactions in the Amended Complaint.  In 2013, Southern reported "cost increases and/or schedule delays" at the Kemper Project.  Ex. 9 at 31. Southern also disclosed that Mississippi Power had to restate and correct its financial statements because Mississippi Power "fail[ed] to maintain sufficient evidence supporting certain estimated amounts included in the Kemper [Project] cost estimate and to fully communicate the related effects" of that failure.  *Id.* at 41.  Southern later disclosed in 2016 and 2017 that "while the current estimated operational availability estimates reflect ultimate results similar to those presented in . . . 2010 . . . , the ramp up period for the current estimates reflects a lower starting point and a slower escalation rate."  Ex. 11 at 113; Ex. 12 at II-105.

Southern also disclosed several lawsuits filed prior to Relator's initiation of this suit, the allegations of which Relator repeats in her Amended Complaint.  *See* Exs. 10, 12, 13, 42, 43, 47–50.  For instance, as disclosed by Southern in February

2017, a securities class action by the Monroe County Employees' Retirement System alleged, *inter alia*, that Southern's "announcement of cost overruns and increased cost estimates . . . was a materialization of the risks concealed by Defendants' false assurances that the plant was on schedule" to be completed in 2014.  Ex. 12 at II-40; Ex. 48 ¶ 207.  Among its many allegations, the *Monroe County* litigation specifically alleged that Defendants "broke logic ties" to manipulate the Kemper Project's schedule.  *Compare* Ex. 48 ¶¶ 6–7, *with* Am. Compl. ¶ 109.  Additionally, as disclosed by Southern in August 2017, two federal shareholder derivative actions alleged, *inter alia*, that certain directors and officers of Southern and Mississippi Power made, authorized, and failed to correct "false or misleading statements regarding the Kemper [Project's] schedule and cost."  Ex. 13 at 40–41.  And Southern disclosed in 2016 that "[t]he SEC [was] conducting a formal investigation of Southern . . . and Mississippi Power concerning the estimated costs and expected in-service date of the Kemper [Project]." Ex. 11 at 113.[8]  Relator merely repeats and repurposes allegations from these lawsuits and the SEC investigation in her Amended Complaint.  *See, e.g.*, Am. Compl. ¶¶ 109, 122–23, 132.

As the extensive public record detailed above demonstrates, Relator's allegations are "substantially the same allegations or transactions" from prior public

---

[8] In November 2017, Southern disclosed that the SEC had concluded its investigation "without recommending an enforcement action."  Ex. 14 at 5.

disclosures.  *Osheroff*, 776 F.3d at 814.  Defendants thus satisfy the "quick trigger" of the substantial similarity inquiry.  *Id.*

(c)   <em>Relator Is Not an Original Source.</em>

Because Relator's allegations are substantially the same as prior public disclosures, this suit survives only if she is as an original source.   31 U.S.C. § 3730(e)(4)(A).   An original source is someone who "either (i) *prior to a public disclosure* . . . , has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based," or (ii) "has knowledge that is independent of and *materially adds to the publicly disclosed allegations or transactions*, and who has voluntarily provided the information to the Government before filing an [FCA] action[.]"   § 3730(e)(4)(B) (emphasis added).   "[A]dditional background information" supplied by a relator does not suffice to qualify her as an original source.   *United States v. Odom*, No. 3:20CV3678-MCR-ZCB, 2023 WL 5203000, at *7 (N.D. Fla. Jun. 22, 2023).   Whether Relator is an original source is "a legal conclusion . . . not entitled to the presumption of truth."   *U.S. ex rel. Schubert v. All Children's Health Sys., Inc.*, 941 F. Supp. 2d 1332, 1336 (M.D. Fla. 2013).

Here, Relator alleges that there have been no public disclosures prior to the filing of her complaint, and the Amended Complaint is devoid of any specific information regarding when she purportedly informed DOJ of the substance of her allegations.   *See* Am. Compl. ¶ 34.   Relator merely states that she "voluntarily

16

provided" them to DOJ prior to initiating this action.  *Id.*  But Relator has restated allegations and transactions that were heavily reported in public disclosures for many years preceding the filing of her Complaint.  *See infra*; Ex. 3.  Thus, her contention that there have been no prior public disclosures is simply incorrect, and she necessarily proceeds under the second prong of the original source exception.

As demonstrated, Relator's allegations are recycled from years' worth of prior public disclosures from innumerable sources.  To the extent her allegations add any nuance to the public discourse on cost, schedule, and availability, such allegations amount to "additional background information" immaterial to what was already reported, disclosed, investigated, and litigated *ad naseum* prior to Relator initiating this action.  *Odom*, 2023 WL 5203000, at *7; *Fed. Deposit Ins. Corp. v. Fifth Third Bank, N.A.*, 651 F. Supp. 3d 722, 728 (S.D.N.Y. 2023), *aff'd*, 23-209-CV, 2023 WL 7130553 (2d Cir. Oct. 30, 2023) ("[T]here are always additional nuances or details of a scheme that a relator may set forth, but that does not make [her] claims unique.").  As such, Relator cannot qualify as an "original source" and her claims are barred by the public disclosure bar as a matter of law.

**B.    Relator's Allegations of Fraud Are Not Sufficiently Particular Under Federal Rule of Civil Procedure 9(b).**

To survive a motion to dismiss, Relator must allege (i) that each category of her allegations—(1) schedule delays, (2) cost overruns, and (3) availability estimates—was material to the DOE's continued funding and, (ii) that the

Defendants knew their claims or statements were false when made.  Relator fails on both accounts.

*Materiality.*  The FCA defines "materiality" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."  31 U.S.C. § 3729(b)(4).  The "materiality requirement is demanding." *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 194 (2016).  Contractual requirements are not automatically material, even if they are conditions of payment.  *See id.*  "[I]f the Government pays a particular claim in full despite actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material."  *Id*. at 195.

*Knowledge & Falsity.*  Both § 3729(a)(1)(A) and (a)(1)(B) require a relator to prove that the defendant acted with knowledge vis-à-vis the purportedly false claim or statement.   The FCA defines "knowingly" to include (1) "actual knowledge," (2) "deliberate ignorance," or (3) "reckless disregard of the truth." 31 U.S.C. § 3729(b)(1); *see also United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 751 (2023).  The Eleventh Circuit has held that the FCA requires "an objective and knowing falsehood," and other circuits have observed that knowledge and falsity are intertwined.  *United States v. AseraCare, Inc.*, 938 F.3d 1278, 1301 (11th Cir. 2019); *see United States ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1018 (7th Cir. 1999); *United States ex rel. Morton v. A Plus Benefits, Inc.*, 139

F. App'x. 980, 982 (10th Cir. 2005).

>    1.    **Schedule Delays**

Relator fails to meet her pleading obligation with respect to her schedule-delay allegations.   First, as to ***materiality***, the CA nowhere contemplates a mandatory Project completion date; nor does it condition payment of federal funds on the same.   Rather, the CA set forth aspirational goals with respect to schedule. *See* Ex. 1 § 2.5(I) ("The parties recognize that the dates set forth" in the CA—including the 2014 "demonstration" date—"are *approximate*[.]" (emphasis added)); *c.f.* 48 C.F.R. § 35.002 (acknowledging that it is "difficult to judge the probabilities of success" for R&D efforts).   And even assuming that adherence to any schedule requirement was a condition to payment under the CA (which it clearly was not), the DOE continued funding the Kemper Project—and continued to enter into modifications of the CA with Southern—"despite actual knowledge" that Kemper's schedule was delayed because such information was publicly disclosed by Southern and others in a multitude of sources as early as 2013.   *See generally* Ex. 2; Ex. 3. This is "strong evidence" that Relator has not satisfied her pleading obligations as to materiality.   *Escobar*, 579 U.S. at 195.

Second, as to ***knowledge***, Relator utterly fails to demonstrate that Defendants knew any statement concerning schedule estimates was false when made.   Relator alleges in conclusory fashion that "Defendants knew that the official schedule for

Kemper could not be achieved." Am. Compl. ¶ 108. But she does not allege any facts to support this allegation; instead, she baldly asserts that Defendants "manipulat[ed]" their scheduling software and "discouraged employees from raising concerns about the schedule," without alleging how such actions were necessarily fraudulent or demonstrate Defendants' state of mind as to any specific representation regarding the schedule. *Id.* ¶ 109. Moreover, Relator makes no allegation demonstrating that, for instance, any "false representations about Kemper's cost and schedule . . . [made] to DOE during regular production meetings" were made with knowledge of falsity at any given time, especially considering that the schedule was under evaluation throughout the Project's construction, and the estimated completion date for the Project was only approximate. *Id.* ¶ 126; Ex. 1 § 2.5(I).

### 2.   Cost Overruns

Relator also fails to meet her pleading obligation with respect to cost overruns. First, as to ***materiality***, the CA did not set forth any requirement or obligation for budget or cost for the Project. Moreover, the CA delineated the percentage of costs for which the DOE would be responsible and set a cost cap which the DOE's contribution could not surpass. *See* Ex. 1 § 2.7. And when Defendants disclosed in 2013 (and for several years thereafter) that there were significant challenges resulting in cost overruns, not only did the DOE continue to modify the CA, it also authorized the second disbursement of funds for Kemper in 2016. *See* Ex. 6 at 23,

Ex. 19 at 29 (Chris Smith's 2013 Senate testimony that "[Southern was] over double the cost."); *see generally* Ex. 2.  Under the plain language of the CA, the DOE would not spend any additional funds beyond its set percentage of cost-sharing and would not be obligated to reimburse Defendants for any cost overruns.  *See* Ex. 1 § 2.7. Relator thus has not and cannot demonstrate that any alleged misrepresentation as to cost overruns was material to the DOE's decision to pay Defendants.

As to **knowledge**, Relator alleges that "[e]ven before the DOE disbursements began and before ground was broken at the end of 2010, Defendants knew that the Certified Cost Estimate of $2.4 billion would not be achievable."  Am. Compl. ¶ 82. In support of this allegation, Relator relies upon internal emails that "question[ed] the reality of the estimate," memorialized "well-founded concerns" about achievability, or indicated that individuals at Southern or Mississippi Power believed the cost estimates to be "unrealistic."  *Id.* ¶¶ 83–84, 105.  However, questioning estimates and testing the assumptions upon which they were made does not amount to knowledge that the original estimates were false.  Relator does not point to any communication or action by Defendants demonstrating that they had the requisite knowledge that Defendants could not, in fact, meet the original cost estimates. Indeed, Relator *cannot* do so.  Defendants did not make any guarantees as to cost in the CA, which repeatedly refers to "*estimated* project costs."  *See, e.g.*, Ex. 1 § 2.5 (emphasis added).  The cost of the Kemper Project was routinely monitored,

evaluated, and updated on a real-time basis.  Relator makes no plausible allegation explaining how Defendants could have acted with knowledge of falsity as to cost *estimates* which were never enforced as mandatory benchmarks in the CA.

### 3.  Availability Estimates

Relator fails to meet her pleading obligation with respect to Defendants' availability estimates.   First, as to ***materiality***, the CA did not contain any requirement or obligation for Defendants with respect to availability, setting forth only an initial aspirational goal of 80% availability as a "performance target."  Ex. 1, Attach. A at 8–9.   Relator failed to allege any facts demonstrating how a "performance target" was material to the DOE's decision to pay Defendants.

Second, as to ***knowledge and falsity***, Relator has not sufficiently pleaded that Defendants made a knowingly false statement at the time availability estimates were communicated to the MPSC or the DOE.  She contends that the original availability estimate from 2009 was "flawed from the start" because it was based on "knowingly false premises."  Am. Compl. ¶¶ 24, 114.  Not only does this allegation say nothing about the purported fraud (and pre-date the 2010 amendment to the FCA), Relator herself acknowledges that early designs for the plant, including availability estimates, actually required "speculation." *Id.* ¶ 114.

Moreover, Relator alleges that "as early as 2012, and no later than 2014," Defendants commissioned a re-estimate of availability from World Oil Services

revealing that availability would "achiev[e] a rate of only 35% in the first year." Am. Compl. ¶ 115.   According to Relator, Defendants never disclosed any re-estimate to the DOE until April 20, 2016—after the DOE's 2016 disbursement of federal funds.  *Id.* ¶ 117.  She contends that "[h]ad Defendants been honest, then DOE . . . would not have paid Defendants the additional $137 million."  *Id.* ¶ 22.  As factual support, she points only to a single conversation that she had with Bruce Harrington, the Kemper Plant Manager.  *Id.* ¶¶ 118–20.  Not only are her allegations vague and conclusory (flouting Rule 9(b)'s requirement of particularity), Relator is also flatly wrong that Defendants withheld information about allegedly flawed availability estimates and subsequent re-estimates.   Rather, the public record demonstrates that Defendants were consistent in their assertions that availability estimates were continually evolving and would continue to do so even after the plant was operational.

First, as discussed above, in January 2010, Thomas Anderson testified to the MPSC that "it [would] take some time to achieve operational excellence comparable to other Mississippi Power generating units"; testimony that was echoed later in 2014 by Pegasus Global Holdings, Inc., noting  "potential operational uncertainty of the Project."  Ex. 20 at 9; Ex. 39 at 128.   Samuel Sumner testified to the MPSC in May 2015, sponsoring an exhibit of the updated availability ramp showing a slower ramp-up than the original estimate.  Ex. 21 at 9, SGS-3.  And in an April 2016 IM

report, the MPSC IMs stated that the "final report" of the availability analysis Defendants initiated to re-evaluate Kemper's availability—which Relator claims was kept a secret from the MPSC and the DOE—would be "completed in *2 to 3 months*." Ex. 24 at 17 (emphasis added).[9] Thus, contrary to Relator's allegations, Defendants disclosed revisions to the original availability estimates prior to receiving the second disbursement of funds from the DOE. Relator has made no other factual allegation that Defendants committed a knowing falsity regarding availability, and she thus has failed to satisfy Rule 9(b).[10]

*     *     *

Relator's Amended Complaint has missed the mark on materiality under the FCA writ large. She would have the Court believe that Defendants' representations regarding the Project's cost, schedule, and availability were the sole factors material to the DOE's decision to fund the Kemper Project—irrespective of the reality that the cost, schedule, and availability metrics were aspirational from the inception of the R&D Project. Instead, as made apparent by both the CA and the DOE's own

---

[9] Defendants respectfully move this Court to take judicial notice of the MPSC regulatory filings. *See* Exs. 20–28, *Osheroff*, 776 F.3d at 811 n.4 ("Courts may take judicial notice of publicly filed documents," including "for the limited purpose of determining which statements the documents contain." (citations omitted)).

[10] Relator has failed to allege that Defendants knew at any given time that the cost, schedule, and availability estimates were actually false when made. She has also failed to plead the actual submission of a false claim. *U.S. ex rel. Clausen v. Lab'y Corp. of Am.*, 290 F.3d 1301, 1310 (11th Cir. 2002). Thus, Relator has failed to state a claim upon which relief can be granted pursuant to Rule 12(b)(6).

words, the demonstration of TRIG technology was the *only* consideration material to the DOE's decision to partner with Defendants in this R&D effort.  As Relator acknowledges in her Amended Complaint, the CA articulated that "[t]he overall objective of the [P]roject [was] to design, construct, and operate a [Transport Gasifier-]based advanced integrated gasification combined cycle power plant[.]"  Ex. 1, Attach. A at 9; Am. Compl. ¶ 37.  That objective was accomplished: the DOE—after the Kemper Project's gasification operations were suspended (and before Relator filed her Complaint)—lauded the Kemper Project as a "first-of-a-kind system[]," announcing that "[t]he scale-up of the core TRIG technology *has been successfully demonstrated*" and that "the technology is ready to serve energy needs[.]"  Ex. 5 at 3.  Each and every allegation of Relator's to the contrary thus holds no water.  The Kemper Project was not the source of an allegedly far-reaching scheme to defraud the DOE out of millions of dollars; rather, it was the result of a successful R&D partnership between Defendants and the DOE resulting in the demonstration of a first-of-its-kind technology.  *See* Ex. 59 at 9  (the DOE recognizing Southern as an "ambitious and forward-leaning partner" after shutdown of the gasifier).

## V.    CONCLUSION

For the reasons stated herein, Defendants respectfully request that the Court dismiss Relator's Amended Complaint with prejudice.

Dated: February 2, 2024          Respectfully submitted,

                                */s/ Walter W. Davis*

                                Walter W. Davis
                                (Georgia Bar No. 213083)
                                Robert Watts
                                (Georgia Bar No. 793350)
                                Jane Ashley Ravry
                                (Georgia Bar No. 451038)
                                JONES DAY
                                1221 Peachtree Street, N.E.
                                Suite 400
                                Atlanta, GA 30361
                                Telephone: (404) 521-3939
                                Facsimile: (404) 581-8330
                                wwdavis@jonesday.com
                                rwatts@jonesday.com
                                jravry@jonesday.com

                                *Counsel for Defendants*

26

## **CERTIFICATE OF SERVICE**

I hereby certify that on February 2, 2024, I caused a copy of the foregoing Certificate of Interested Persons to be electronically filed with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

*/s/ Walter W. Davis*
Walter W. Davis

*Counsel for Defendants*

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned certifies, pursuant to LR 5.1C, that this document has been prepared in Time New Roman, 14 point, as approved by the Court.

<u>*/s/ Walter W. Davis*</u>
Walter W. Davis


*Counsel for Defendants*